728 F.2d 52
 14 Envtl. L. Rep. 20,284
 COUNTY OF SUFFOLK, et al., Plaintiff-Appellant,
v.
LONG ISLAND LIGHTING COMPANY, General Electric Company,
Stone & Webster Engineering Corporation, Courter &
Company, Inc., Dravo Utility
Constructors, Inc., and
Comstock-Jackson,
Defendants-
Appellees.
 No. 23, Docket 83-7122.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 29, 1983.
Decided Jan. 25, 1984.
 
 Irving Like, Babylon, N.Y. (Reilly, Like & Schneider, Babylon, N.Y. of counsel), for plaintiff-appellant.
 Joseph M. Spivey, III, Richmond, Va. (W. Taylor Reveley, III, D. Alan Rudlin, Lewis F. Powell, III, Hunton & Wiliams, Richmond, Va., Edward M. Barrett, Rosalind M. Gordon, Mineola, N.Y., George D. Reycraft, Richard J. Wiener, Cadwalader, Wickersham & Taft, New York City, of counsel), for defendant-appellee, Long Island Lighting Co.
 William A. Gordon, Chicago, Ill. (John M. Carroll, Mayer, Brown & Platt, Chicago, Ill., of counsel), for defendant-appellee, General Elec. Co.
 Robert J. Bagdasarian, New York City (Thomas A. Shaw, Jr., Breed, Abbott & Morgan, New York City, of counsel), for defendant-appellee, Courter & Co., Inc.
 Donald J. Zoeller, New York City (Laurence V. Senn, Jr., Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, of counsel), for defendant-appellee, Stone & Webster Engineering Corp.
 John S. Kinzey, New York City (LeBoeuf, Lamb, Leiby & MacRae, New York City, of counsel), for defendant-appellee, Dravo Utility Constructors, Inc.
 Alvin M. Stein, New York City (Menachem J. Kastner, Parker, Chapin, Flattau & Klimpl, New York City, of counsel), for defendant-appellee, Comstock-Jackson.
 Before KEARSE, CARDAMONE and WINTER, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 On this appeal we consider the dismissal by the United States District Court, 554 F.Supp. 399, for the Eastern District of New York of Suffolk County's complaint, instituted on behalf of the county's electric utility ratepayers, against the operation by Long Island Lighting Company of its Shoreham Nuclear Power Facility. The uncertainty about whether such a power plant can be operated safely has stirred deep public concern. Shoreham's critics contend that as the beauty of the Acropolis symbolizes the Golden Age of ancient Greece, an unsightly, deserted nuclear power plant will symbolize Twentieth Century America. Its defenders claim that a safe-working nuclear plant producing electricity, as in France, Britain, Japan and Germany, will free America from dependence on foreign oil and symbolize the triumph of technology over the loss of natural resources. We are not called upon to answer these questions involving large benefits and risks within which this appeal arises, but to decide whether the district court properly dismissed plaintiff's complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. We affirm Judge Bartel's decision.
 
 I--BACKGROUND
 
 2
 On behalf of a class of approximately 800,000 ratepayers, plaintiff County of Suffolk (Suffolk) seeks injunctive and rate relief against Long Island Lighting Company (LILCO) and several major contractors involved in the construction of the Shoreham Nuclear Power Facility (Shoreham). Grounded in common law tort and contract principles, the complaint alleges that defendants' negligence caused serious defects in the design and construction of Shoreham and that those defects, in turn, caused unreasonable escalations in the cost of the facility. Accordingly, plaintiff asked the trial court to order an inspection of the facility, enjoin its operation, enjoin LILCO from including in its rate base costs attributable to the alleged defects and order LILCO to refund payments that correspond to prior increases in its rate base. The district court concluded that plaintiff's claims were preempted by federal and state law and therefore dismissed the complaint, leaving plaintiff to its administrative remedies.
 
 
 3
 In 1967 the defendant Long Island Lighting Company designed the Shoreham Nuclear Power Station. The following year LILCO applied to the Atomic Energy Commission (AEC)--predecessor of the Nuclear Regulatory Commission (NRC)--for a construction permit as required by the Atomic Energy Act of 1954, as amended, 42 U.S.C. Secs. 2011 et seq. (the AEA or the Act). After two years of review by the AEC staff and the Advisory Committee on Reactor Safety, and three years of adjudicatory hearings before the Atomic Safety and Licensing Board, a construction permit issued.
 
 
 4
 The construction of Shoreham has been an incredibly costly endeavor. In 1969 LILCO projected total construction costs of $261 million. Cost escalations and overruns have pushed Shoreham's pricetag to 15 times the original estimate or over $4 billion. To alleviate its financial burden, LILCO applied to the New York State Public Service Commission (PSC) for part of these construction costs to be included in its rate base. The PSC has already permitted inclusion of $355 million in construction work-in-progress costs. And it is presently considering the ratemaking principles that will govern the absorption of Shoreham's remaining costs into LILCO's rate base. In addition, the PSC launched an investigation into the dramatic escalation of Shoreham's costs. Appellant Suffolk has been a party in these administrative proceedings and, in fact, already suffered one setback in state court when it unsuccessfully sought to overturn part of the PSC's inclusion--some $200 million--of costs in LILCO's rate base. Consumer Protection Board v. Public Service Commission, 78 A.D.2d 65, 434 N.Y.S.2d 820 (3d Dep't 1980), motion for leave to appeal denied, 53 N.Y.2d 607 (1981).
 
 
 5
 LILCO applied to the NRC in January 1976 for a license to operate Shoreham. As with the PSC hearings, Suffolk subsequently intervened in the NRC licensing proceedings and is currently a participant. At the time of this appeal, the construction of Shoreham is not yet completed, although LILCO had hoped to begin fuel loading during 1983. In the meantime, LILCO's operating license application remains under consideration before the NRC.
 
 
 6
 Despite Suffolk's ongoing involvement in the state and federal administrative proceedings, it initiated this putative class action in New York State Supreme Court on June 23, 1982. Defendants immediately removed the action to the United States District Court for the Eastern District of New York on the ground that plaintiff's claim arose under federal law--the Atomic Energy Act. Plaintiff sought a remand to the state court, but the district court retained jurisdiction holding that plaintiff's right to relief hinged on whether LILCO had violated NRC-promulgated regulations. County of Suffolk v. Long Island Lighting Co., 549 F.Supp. 1250 (E.D.N.Y.1982). On November 17, 1982 defendants moved to dismiss the complaint for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6). On January 14, 1983 Judge Bartels granted the motion in a published opinion. County of Suffolk v. Long Island Lighting Co., 554 F.Supp. 399 (E.D.N.Y.1983).
 
 
 7
 To say that Suffolk's 33 page complaint is comprehensive would be an understatement. Briefly summarized, it alleges negligence, strict liability, breach of contract, and misrepresentation and concealment on the part of all the defendants involved in the construction and supervision of Shoreham. The specifics of these allegations, too numerous to detail, run the gamut from managerial neglect to conspiracy to industrial sabotage. The gist of Suffolk's complaint is that defendants have caused such serious defects in the Shoreham facility as to have posed a substantial risk to the public safety and to have contributed to the unreasonable cost escalations that plaintiff class will eventually bear in higher electric rates. For relief Suffolk seeks: a physical inspection of all systems of Shoreham essential to safety, reliability and economy of operation; retroactive and prospective rate relief in the form of money damages for past overcharges and an injunction against the inclusion in LILCO's rate base of any construction costs attributable to design or construction defects; and an injunction against commencement of Shoreham's operation pending an inspection and final judicial disposition of these proceedings.
 
 
 8
 The district court offered three alternative justifications for its dismissal of Suffolk's complaint. It found that plaintiff's claims were essentially safety based and thus preempted by the NRC's regulatory authority under the Act. Further, the rate relief was subject to the exclusive jurisdiction of the PSC and consequently preempted under New York statutory law. Finally, the district court declared as a matter of law that even were federal and state preemption not applicable, the facts alleged in the complaint did not support any of plaintiffs' claimed common law causes of action.
 
 II. ANALYSIS
 
 9
 Contending that the trial court erroneously dismissed its complaint, Suffolk seeks to refute each of the three grounds upon which dismissal was predicated. First, it argues, the Atomic Energy Act does not preempt its tort and contract claims because those claims are not directed at radiological safety hazards--an area concededly reserved to the NRC--but rather at the "pocketbook" issue of unreasonable and excessive cost. Second, appellant asserts that the New York Public Service Law does not preempt its claims because these same tort and contract actions fall outside the PSC's jurisdiction. Hence, the argument continues, absent an available administrative remedy, the courts should entertain appellant's claims. Third, appellant urges that its common law causes of action for negligence, strict liability, breach of contract, and misrepresentation and concealment are legally sufficient.
 
 
 10
 We shall deal with each of these arguments in turn. Because the complaint was dismissed for failure to state a claim, we accept as true all material factual allegations of the complaint and construe its terms in favor of the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).
 
 A. Federal Preemption
 
 11
 The doctrine of federal preemption has a long and detailed history, but for purposes of this discussion it can be reduced to a few simple principles. Federal preemption has its roots in Article VI, cl. 2 of the Constitution, which states that the Constitution and laws of the United States are the supreme law of the land and shall be binding on the states. See Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 92-93, 6 L.Ed. 23 (1824). Accordingly, whenever the federal government possesses the authority to regulate a given area, Congress may exercise this authority so as to exclude states from asserting concurrent jurisdiction over the same subject matter. See generally L. Tribe, American Constitutional Law Sec. 6-23 (1978).
 
 
 12
 Preemption may occur in several ways. The most obvious is where Congress expressly states that it is preempting state authority. Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Alternatively, state law is preempted to the extent that it directly conflicts with federal law. For example, compliance with both federal and state regulations may in some circumstances be impossible, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-18, 10 L.Ed.2d 248 (1963), or state law may impede the "execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Even absent such explicit or functionally overt preemption, Congress' intent to supersede state law may be found from "a scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Some of the factors involved in the determination of whether it is Congress' purpose to occupy a given field include: (1) the aims of Congress as revealed by the statutory language and legislative history, Florida Lime & Avocado Growers, Inc. v. Paul, supra, 373 U.S. at 147-50, 83 S.Ct. at 1219-21; (2) the subject matter of the regulated field and the interest in uniformity, id. at 143-44, 83 S.Ct. at 1217-18; (3) the pervasiveness of the federal regulatory scheme, Rice v. Santa Fe Elevator Corp., supra, 331 U.S. at 230, 67 S.Ct. at 1152; and (4) the impediments that state regulation might pose to federal objectives, Hines v. Davidowitz, supra, 312 U.S. at 67, 61 S.Ct. at 404.
 
 
 13
 In light of these concepts, we must engage in a two step analysis. The first task is to decide the relative spheres of federal and state authority under the Atomic Energy Act. Once that is determined, we then examine appellant's complaint to assess whether the claim for relief impermissibly intrudes on areas of exclusive federal jurisdiction. Before undertaking this two step analysis, it is helpful to outline the pertinent history of the AEA.
 
 
 14
 Prior to 1954 the use of and control over nuclear power remained exclusively within the province of the federal government. To promote the commercial use and development of nuclear power, Congress enacted the Atomic Energy Act of 1954, ch. 1073, 68 Stat. 919, as amended, 42 U.S.C. Secs. 2011 et seq. (1976). See H.R.Rep. No. 2181, 83d Cong., 2d Sess. 1-11 (1954). The AEA was Congress' first attempt to apportion control of nuclear energy between the federal government and the states. On the one hand, it granted the AEC exclusive jurisdiction to regulate the safety aspects of nuclear power plants, including the authority to license the transfer, delivery, receipt, acquisition, possession and use of nuclear materials. 42 U.S.C. Secs. 2014, 2061-64, 2071, 78, 2091-99, 2011-14. On the other hand, it left to the states the authority over the generation, sale and transmission of electric power produced through the use of nuclear facilities. 42 U.S.C. Sec. 2018.
 
 
 15
 In 1959 Congress expanded the role of the states by enacting Sec. 274 of the AEA, 42 U.S.C. Sec. 2021, which permits the NRC to transfer to state regulatory authorities certain responsibilities regarding byproduct and source materials. 42 U.S.C. Sec. 2021(b). Notably, Congress maintained the NRC's exclusive jurisdiction to regulate "the construction and operation of any production or utilization facility." 42 U.S.C. Sec. 2021(c)(1).
 
 
 16
 Despite this clear delineation of the separation of powers between federal and state authority, appellant argues that the 1959 amendments gave even greater authority to the states. Specifically, appellant points to Sec. 274(k) which states, "[n]othing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards." 42 U.S.C. Sec. 2021(k). According to appellant, this provision permits the states to regulate for any purpose other than the protection against radiological hazards.
 
 
 17
 Our analysis begins with the first step of deciding the relative spheres of federal and state authority under the AEC. Fortunately, our chore with respect to this determination is made easier by the fact that the Supreme Court has recently undertaken an exhaustive analysis of the AEA's preemptive effects in Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Development Comm'n, --- U.S. ----, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (Pacific Gas ). In Pacific Gas the Supreme Court upheld a California statute that had imposed a moratorium on the certification of new nuclear plants until a state commission found that there existed, and the NRC approved, a demonstrated technology for disposal of wastes. With respect to Sec. 274(k), the Court held that this section was designed merely to curtail any preemptive effects of the 1959 amendments so that the states would not lose any of the authority already granted to them in 1954. The court stated that this provision was not intended as an affirmative grant of power to the states. In so stating, the Supreme Court foreclosed the broad reading of Sec. 274(k) advanced by appellant. Pacific Gas, supra, at ----, 103 S.Ct. at 1725.
 
 
 18
 More important for our purposes are the conclusions drawn by the Court as to the preemptive effects of the AEA. It referred to the clear separation of powers under the Act: "[T]he federal government maintains complete control of the safety and 'nuclear' aspects of energy generation; the states exercise their traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like." Id. The Court then commented that a state, in evaluating the need for a nuclear generating facility, could not even consider the safety aspects.
 
 
 19
 State safety regulation is not preempted only when it conflicts with federal law. Rather, the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states. When the federal government completely occupies a given field or an identifiable portion of it, as it has done here, the test of preemption is whether "the matter on which the state asserts the right to act is in any way regulated by the federal government."
 
 
 20
 Id. at ----, 103 S.Ct. at 1726 (quoting Rice v. Santa Fe Elevator Corp., supra, 331 U.S. at 236, 67 S.Ct. at ----) (emphasis supplied). Applying this test to the facts before it in Pacific Gas, the Court found an adequate non-safety rationale for California's moratorium--i.e., the statute was aimed at economic concerns, not safety hazards. Id. at ----, 103 S.Ct. at 1729.
 
 
 21
 Having completed the first step of determining the state-federal spheres of authority, we take the second step by analyzing appellant's complaint to see if it impermissibly intrudes in the federal area. If, as the district court found, Suffolk's claims were motivated by safety concerns, they are preempted. Moreover, even assuming the relief sought was not motivated by safety concerns, the claims still are preempted if they would impermissibly infringe on the NRC's exclusive regulatory authority regarding the "construction and operation" of a facility. The complaint appears, at least in some respects, to be motivated by safety concerns. In fact, some paragraphs specifically refer to the ill effects defendants' alleged misdeeds might have on the public health, safety and welfare. For example, Suffolk urges that defects in the design and construction of Shoreham will impair the plant's safety, increasing the risk of a major accident. In addition, Suffolk predicates its standing to sue on the assertion that it "is responsible for the protection of the health, safety and well-being of its citizens, which would be adversely affected if design and construction defects in Shoreham caused or contributed to an accident." To the extent that these safety concerns pervade the complaint, appellant's claims are preempted.
 
 
 22
 Further, we agree with the district court's ruling that the complaint is preempted insofar as it seeks to enforce NRC-promulgated regulations. The general enforcement provision of the AEA, 42 U.S.C. Sec. 2271, expressly precludes private judicial enforcement of the Act, except under clearly enumerated conditions.
 
 
 23
 No action shall be brought against any individual or person for any violation under this chapter unless and until the Attorney General of the United States has advised the Commission with respect to such action and no such action shall be commenced except by the Attorney General....
 
 
 24
 42 U.S.C. Sec. 2271(c). See, e.g., Simmons v. Arkansas Power & Light Co., 655 F.2d 131, 134 (8th Cir.1981) (private litigant cannot force closing of nuclear power plant pending development of emergency plan for reactor accidents); Liesen v. Louisiana Power & Light Co., 636 F.2d 94, 95 (5th Cir.1981) (private litigant cannot enjoin construction of nuclear power plant claiming violations of AEA standards and regulations); Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor, 619 F.2d 231, 237-39 (3d Cir.1980), cert. denied, 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981) (private litigants cannot enjoin nuclear plant operators based upon allegations of a plan to release radioactive water into the Susquehanna River). Of course, concerned parties are not barred from participating in the administrative process. As appellant's ongoing involvement in the NRC licensing proceedings demonstrates, intervention in agency proceedings is always available. See 10 C.F.R. Sec. 2.714 (1983). See also 42 U.S.C. Sec. 2239(a) (requiring NRC to grant a hearing upon request to parties interested in the issuance or modification of construction and operating licenses). Moreover, intervenors in administrative proceedings may appeal initial licensing decisions first to the Atomic Safety and Licensing Appeals Board, 10 C.F.R. Sec. 2.785, and ultimately to the NRC, id. Sec. 2.786. Finally, after all administrative remedies have been exhausted--which is not the case here--appeal may be taken to the United States Circuit Courts. 42 U.S.C. Sec. 2239(b); Simmons v. Arkansas Power & Light Co., supra, 636 F.2d at 95; Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor, supra, 619 F.2d at 237-39. Thus, appellant eventually will have recourse to the federal courts for the purpose of enforcing NRC-promulgated regulations. But to the extent the present complaint seeks such enforcement, it is preempted.
 
 
 25
 A third problem with the complaint is its prayer for injunctive and declaratory relief--i.e., an independent physical inspection of Shoreham and an injunction against commencement of Shoreham's operation pending final disposition of these proceedings. To grant either of these actions would plainly intrude on areas of exclusive NRC jurisdiction. Pursuant to 42 U.S.C. Sec. 2021(c)(1), the NRC retains responsibility to regulate "the construction and operation of any production or utilization facility." This necessarily includes the authority to inspect nuclear power plants. See, e.g., 10 C.F.R. Sec. 1.64 (1983) (duties of Office of Inspection and Enforcement include administering inspection of licenses). The NRC can, if it chooses, delegate this authority to the states, 42 U.S.C. Sec. 2021(i), but it has not done so here. Instead, through May, 1982 the NRC has undertaken a rigorous, systematic program consisting of 146 regular and three special on-site inspections of Shoreham. Since September 30, 1979 the NRC has assigned permanent inspectors to Shoreham for purposes of making daily inspections. Under the standard of preemption enunciated by the Supreme Court in Pacific Gas, a court ordered inspection, whether it be for safety or non-safety purposes, would obviously invade the NRC's exclusive regulatory province. Similarly, an injunction that even temporarily shuts down the Shoreham facility would infringe on the NRC's authority over construction and operation.
 
 
 26
 It is true that in certain instances this Court may sanction state actions that supplement federal regulations, so long as compliance with the purposes that brought about federal enactment is not likely to be significantly impeded. See, e.g., Colorado Anti-Discrimination Comm'n v. Continental Air Lines, Inc., 372 U.S. 714, 722-24, 83 S.Ct. 1022, 1026-27, 10 L.Ed.2d 84 (1963) (upholding state statute barring discriminatory hiring); California v. Zook, 336 U.S. 725, 730, 69 S.Ct. 841, 843, 93 L.Ed. 1005 (1949) (upholding state prohibition of transportation not licensed by ICC). In the instant case we fully recognize that appellant's goal by means of inspections, injunctions, enforcement of NRC regulations and the like, is to enhance Shoreham's safety. Vital to their own safety and well-being as they conceive it to be and despite the fact that the action seeks to supplement a very important aspect of the AEA, the area that this complaint treads upon is, nonetheless, one preempted under federal law.
 
 
 27
 Congress originally cited many reasons for passing the AEA. Chief among these was the creation of "a program to encourage widespread participation in the development and utilization of atomic energy for peaceful purposes to the maximum extent consistent with the common defense and security and with the health and safety of the public." 42 U.S.C. Sec. 2013(d). That Congress was concerned with more than safety is made apparent by the Energy Reorganization Act of 1974, 42 U.S.C. Secs. 5801 et seq., which abolished the Atomic Energy Commission and transferred that agency's licensing and regulatory functions to the NRC. According to the 1974 Act's declaration of policy and purpose, Congress sought to meet present and future demands by encouraging the development of energy sources. Id. Sec. 5801. See S.Rep. No. 980, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 5470-71. In sum, federal preemption encompasses both safety and productivity, and a successful energy policy must strike a delicate balance between the two. Were appellant, therefore, to be permitted to inject itself into the process in its attempt to "enhance" the safety of Shoreham, it would upset the balance envisioned in the Congressional scheme. For this reason, responsibility to regulate and enforce the safety aspects of nuclear energy power plants must remain the sole province of the NRC's expertise.
 
 
 28
 Having discussed those aspects of appellant's complaint that are so evidently preempted by federal law, we return to the original question--whether there was an adequate non-safety rationale for Suffolk's claims. Once we untangle the web of allegations in the complaint, dismissing all safety related claims, all efforts to enforce the NRC regulations and all requests for inspections and injunctions against operation, we are left with appellant's prayer for retroactive and prospective rate relief. In essence, appellant argues that defendants' negligence caused an exorbitant increase in the construction costs of Shoreham, and that those increases will be reflected in higher electric rates. Appellant urges that this is a "pocketbook" claim, one not preempted by the Act. Again, relief cannot be granted to plaintiffs because the alleged common law "pocketbook" claim is one preempted by state statutory law.
 
 B. State Statutory Preemption
 
 29
 The New York State Public Service Law provides that the Public Service Commission has original jurisdiction over "the manufacture, conveying, transportation, sale or distribution of ... electricity" as well as "electric plants and ... the persons or corporations owning, leasing or operating the same." N.Y.Pub.Serv.Law Sec. 5(1)(b) (McKinney Supp.1982). Additionally, the PSC has been granted specific jurisdiction under state law to supervise electric rates and to ensure that they are just and reasonable. Id. Secs. 65(1), 66(5) (McKinney 1955). Accordingly, the PSC's authority with respect to ratemaking has been uniformly held to be exclusive and to supersede all common law remedies. Purcell v. New York Cent. R.R., 268 N.Y. 164, 171, 197 N.E. 182 (1935), appeal dismissed, 296 U.S. 545, 56 S.Ct. 173, 80 L.Ed. 387 (1935); Van Dussen-Storto Motor Inn, Inc. v. Rochester Tel. Corp., 42 A.D.2d 400, 403, 348 N.Y.S.2d 404 (4th Dep't 1973), aff'd mem., 34 N.Y.2d 904, 316 N.E.2d 719, 359 N.Y.S.2d 286 (1974); Central Hudson Gas & Elec. Corp. v. Napoletano, 277 A.D. 441, 443, 101 N.Y.S.2d 57 (3d Dep't 1950); Cardone v. Consolidated Edison Co. of N.Y., Inc., 197 Misc. 188, 191, 94 N.Y.S.2d 94 (App.Term 1st Dep't 1949), aff'd mem., 276 A.D. 1068, 96 N.Y.S.2d 491 (1st Dep't 1950); Ten Ten Lincoln Place, Inc. v. Consolidated Edison Co., 190 Misc. 174, 177, 73 N.Y.S.2d 2 (Sup.Ct. Kings Co. 1947), aff'd mem., 273 A.D. 903, 77 N.Y.S.2d 168 (2d Dep't 1948).
 
 
 30
 Despite the consistent interpretation by New York courts of this clear statutory mandate, appellant requests from this court affirmative rate relief. Suffolk contends that defendants have proximately caused numerous design and construction defects in Shoreham, that because of those defects its costs have skyrocketed, that those costs have been--to the extent of $355 million--and will continue to be unjustifiably included in LILCO's rate base and that LILCO's approximately 800,000 customers must bear this burden in the form of higher utility rates. Hence, Suffolk asks us to direct LILCO to remit to its ratepayers all past overcharges and to adjust its electric rates or rate base to prevent future overcharges. By enacting the Public Service Law, New York provided its citizen ratepayers with an administrative remedy before the PSC that effectively precludes the assertion of the common law claims that plaintiff raises in its complaint.
 
 
 31
 The principles underlying state statutory preemption of the common law are analogous to those of federal preemption previously discussed. As is the case with most regulatory agencies, the PSC serves a valuable purpose in promoting uniformity and expertise in the distribution of public power. Ratemaking is part of the Commission's daily work. The Commissioners have a large staff of experts to assist them with the more difficult technical aspects of regulating public utilities. In contrast, courts--whether state or federal--are ill-equipped to set electric rates. Were this Court, for example, to grant appellant its requested relief, it might reduce LILCO's rate base below the level required for LILCO to "break even" and, as a result, drive the company into bankruptcy or out of business. Also, if different courts could set different rates for electric power there would be no uniformity; and the question would arise, what rates govern? To avoid this possibility of confusion New York State confided to the PSC exclusive jurisdiction over rates. Purcell v. New York Central R.R., supra, 268 N.Y. at 171, 197 N.E. 182.
 
 
 32
 Presently, the PSC is examining the very issues that appellant seeks to litigate in this action. See New York State Public Service Commission, Order Establishing Proceeding to Investigate the Cost of the Shoreham Nuclear Generating Facility, Case No. 27563 (May 21, 1979); New York State Public Service Commission, Order Instituting Proceeding, Case No. 28252 (August 12, 1982). In fact, appellant has participated in these agency proceedings from their outset. As the district court noted, LILCO's ratepayers suffer no damages until and unless the PSC acts improperly. Even then their remedy lies in an Article 78 proceeding in state court, not in a common law cause of action in federal court. County of Suffolk v. Long Island Lighting Co., supra, 554 F.Supp. at 408-09. See N.Y.Civ.Prac.Law Secs. 7801-7806 (McKinney 1981 & Supp.1982); Consumer Protection Board v. Public Service Commission, 78 A.D.2d 65, 434 N.Y.S.2d 820 (3d Dep't 1980), motion for leave to appeal denied, 53 N.Y.2d 607, 440 N.Y.S.2d 1027, 423 N.E.2d 58 (1981).
 
 
 33
 Appellant also maintains that the PSC lacks authority to determine questions of law--such as its common law claims--and that, as a result, there is no available administrative remedy. We find this line of argument wholly unpersuasive for no matter how appellant phrases its "pocketbook" action, the claim in essence seeks rate relief. As previously indicated, the PSC has the authority--also the duty--to ensure that rates are just and reasonable. N.Y.Pub.Serv.Law Secs. 65(1), 66(5) (McKinney 1955). More precisely,
 
 
 34
 [w]henever the commission shall be of opinion ... that the rates, charges or classifications or the acts or regulations of any such person, corporation or municipality [under its supervision] are unjust, unreasonable, unjustly discriminatory or unduly preferential or in anywise in violation of any provision of law, the commission shall determine and prescribe ... the just and reasonable rates....
 
 
 35
 Id. at Sec. 66(5). Thus, although the PSC has no authority to determine questions of law, Kovarsky v. Brooklyn Union Gas Co., 253 A.D. 635, 637, 3 N.Y.S.2d 581 (2d Dep't), aff'd, 279 N.Y. 304, 18 N.E.2d 287 (1938), it can, and should, consider the propriety of each cost component LILCO seeks to include in its rate base. If the PSC finds that LILCO acted unreasonably or was guilty of mismanagement so that a rate increase would be unjust, it may deny any such request, in whole or in part, without being required to make a legal finding of negligence or breach of contract. This is the fact of the matter not only because it makes sense--it is highly unlikely, as appellant argues, that the New York Legislature intended the PSC to be a mere "fact-finding body"--but also because the enabling statute expressly clothes the PSC with that authority. Since the PSC has exclusive jurisdiction over appellant's request for retrospective and prospective rate relief, the district court properly dismissed the complaint.
 
 C. Common Law Causes of Action
 
 36
 Even if the doctrines of federal and state preemption did not dispose of this case, we would still affirm the district court's decision because Suffolk's claims are not cognizable under New York common law.
 
 
 37
 The complaint first alleges negligence on the part of LILCO and its contractors. Yet, it fails to indicate any injury incurred by LILCO's ratepayers apart from economic loss. New York law holds that a negligence action seeking recovery for economic loss will not lie. Price Brothers Co. v. Olin Construction Co., 528 F.Supp. 716, 721 (W.D.N.Y.1981); Martin v. Julius Dierck Equipment Co., 43 N.Y.2d 583, 374 N.E.2d 97, 403 N.Y.S.2d 185 (1978). Appellant attempts to circumvent this rule by arguing that the unreasonably dangerous nature of a nuclear power plant creates a substantial likelihood of future injury on a grand scale and that this amounts to more than economic injury. Whether such likelihood exists is not for us to speculate. Moreover, this argument undercuts appellant's earlier assertion that its concerns are economic, and not safety, related. Thus, the fact remains that this complaint does not allege an injury to person or property and therefore does not state a cause of action for negligence.
 
 
 38
 Similar reasoning applies to Suffolk's allegations of strict liability. The nature of strict products liability is to permit recovery for personal injury or property damage caused by a manufacturer's unreasonably dangerous product. Codling v. Paglia, 32 N.Y.2d 330, 340-41, 298 N.E.2d 622, 345 N.Y.S.2d 461 (1973). Because the law deems the manufacturer's duty great and the injury inflicted serious, it bends privity of contract requirements to allow remote purchasers to sue the manufacturer. Id. But where plaintiff's claim is simply that the product did not function properly, requiring its owner to incur costs of repair, then the only injury claimed is one for economic loss, which is not considered sufficiently severe to warrant the abrogation of the privity requirement. Schiavone Construction Co. v. Elgood Mayo Corp., 81 A.D.2d 221, 228-29, 439 N.Y.S.2d 933, (1st Dep't 1981) (Silverman, J., dissenting), rev'd mem. 56 N.Y.2d 667, 436 N.E.2d 1322, 451 N.Y.S.2d 720 (1982) (embracing the views expressed in Justice Silverman's dissenting opinion). Accordingly, the economic loss suffered by LILCO's ratepayers as a result of defects in the Shoreham plant will not support a strict liability claim. See Martin v. Julius Dierck Equipment Co., supra.
 
 
 39
 Appellant's breach of warranty and contract allegations are also flawed, but not for the same reasons. Unlike negligence and strict liability causes of action, which seek to make the injured party "whole," warranty and contract remedies exist to afford injured parties the benefit of their bargain. Hence, economic loss is ordinarily compensable under the latter two theories. See Martin v. Julius Dierck Equipment Co., supra, 43 N.Y.2d at 589, 374 N.E.2d 97, 403 N.Y.S.2d 185. Clearly, though, appellant cannot succeed with these claims, for absent a contractual relationship there can be no contractual remedy. Id. LILCO's ratepayers are not in privity of contract with those defendants who allegedly furnished defective equipment, nor are they third party beneficiaries of the various contracts between LILCO and its contractors. It is ancient law in New York that to succeed on a third party beneficiary theory, a non-party must be the intended beneficiary of the contract, Lawrence v. Fox, 20 N.Y. 268 (1859), not an incidental beneficiary to whom no duty is owed. And, where the promise is to the public or to a class of indefinite extension, the promise in the contract must be one that redounds to their benefit. Ultramares v. Touche, 255 N.Y. 170, 181, 174 N.E. 441 (1931); Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 164, 159 N.E. 896 (1928); Beck v. FMC Corp., 53 A.D.2d 118, 385 N.Y.S.2d 956 (4th Dep't 1976), aff'd mem., 42 N.Y.2d 1027, 369 N.E.2d 10, 398 N.Y.S.2d 1011 (1977). When LILCO entered into its numerous supply and construction contracts, its primary intent was to benefit its shareholders, and any advantages ultimately realized by LILCO's customers were incidental. For this Court to hold otherwise would not only expose contracting parties to countless unforeseeable lawsuits, but would also impair the notion of privity of contract. Nor can we adopt appellant's suggestion that LILCO's unique status as a monopolist-public utility should give rise to a fiduciary responsibility, in accordance with which LILCO would have to act in the best interests of its customers, not just its shareholders. Such view poses numerous problems, not the least of which is that an artificial fiduciary relationship between LILCO and its ratepayers directly contravenes the fiduciary relationship LILCO already occupies with respect to its shareholders. Again, there is no precedent for this theory in New York law, and, given our ruling on the issue of state statutory preemption, no reason to fashion such a remedy presently exists.
 
 
 40
 Finally, appellant cannot maintain a cause of action alleging that LILCO's various misrepresentations and concealments caused the PSC to include improperly in LILCO's rate base certain construction costs. A misrepresentation occurs only where the offending party makes a false statement that induces detrimental reliance by the complainant. Demuth Dev. Corp. v. Merck & Co., Inc., 432 F.Supp. 990, 994 (E.D.N.Y.1977); W. Prosser, Law of Torts Sec. 108, at 714 (4th ed. 1971). In this case, LILCO made legal representations concerning its costs to the PSC, not to its ratepayers. Moreover, the ratepayers can hardly allege that they relied to their detriment on anything LILCO has said, for they never had standing to do so.
 
 III. CONCLUSION
 
 41
 Our affirmance may seem to leave appellant without relief. Since LILCO has a monopoly in the distribution of electric power, its ratepayers cannot go elsewhere to purchase electricity; nor do these ratepayers have economic leverage to pressure LILCO to keep its costs and rates down. Judicial relief is not now available either. As explained, appellant's complaint insofar as it alleges safety claims is preempted by federal law; insofar as it alleges ratemaking claims, it is preempted by state law. In addition, appellant's asserted common law actions of negligence and strict tort liability fail because only economic loss is claimed, and the common law actions for breach of contract and warranty may not lie because privity is lacking.
 
 
 42
 Thus, the only avenue open for appellant is to continue its proceedings in the administrative forum--the NRC for safety-related concerns and the PSC for economic claims. After those agencies render final decisions, appellant has the right to challenge them in federal court pursuant to the AEA, 42 U.S.C. Sec. 2239(b), and under the Administrative Procedure Act, 5 U.S.C. Secs. 701-706 (1982) or in an Article 78 proceeding in state court, if appellant is so advised. With respect to the present appeal, the district court's decision dismissing Suffolk County's complaint must be affirmed.