Charles D. "Charley" WILSON,
Appellee,

v.

James G. HARLOW, Jr., G.W. "Bill"
Swisher, Jr., John F. Snodgrass, Martha
W. Griffin, John A. Taylor, Herbert N.
Champlin, William D. Little, Jr., F. Dail
Harper and Hugh L. Hembree, III, Appellants.

No. 80097.

Supreme Court of Oklahoma.

July 13, 1993.

Rehearing Denied Oct. 5, 1993.

Whit Pate, Poteau, Thomas Dee Frasier, Frasier & Frasier, Tulsa, Gene Stipe, Stipe, Gossett, Harper, Estes, McCune & Parks, McAlester, for appellee.

Hugh D. Rice, H.D. Binns, Jr. & Michael R. Perri, Rainey, Ross, Rice & Binns, Oklahoma City, James G. Wilcoxen, Wilcoxen, Wilcoxen & Primomo, Muskogee, Peter D. Clarke, Deborah H. Bornstein & Deena S. Newlander, Gardner, Carton & Douglas, Chicago, IL, for appellants.

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

WATT, Justice.

In an effort to encourage the development of cogeneration and small power production facilities, and to reduce the demand for fossil fuels, the United States Congress enacted the Public Utility Regulatory Policies Act of 1978 ("PURPA"), Pub.L. 95–617, 92 Stat. 3117 (codified as amended at 16 U.S.C. § 824a–3).[1] The Federal Energy Regulatory Commission ("FERC") was charged with promulgating rules implementing PURPA. 16 U.S.C. § 824a–3(a). One of the ways Congress chose to encourage the development of cogeneration and small power production facilities was to require electric utilities to purchase electric energy from such facilities.[2] Pursuant to

---

1. Cogeneration plants not only produce electricity, but steam or heat that can be used for industrial or commercial purposes. Congress found that such plants are inherently more efficient than typical generating plants that do not use residual energy. *See American Paper Inst., Inc. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 404–05, 103 S.Ct. 1921, 1924, 76 L.Ed.2d 22 (1983); *Federal Energy Regulatory*

*Comm'n ("FERC") v. Mississippi*, 456 U.S. 742, 750, 102 S.Ct. 2126, 2132, 72 L.Ed.2d 532 (1982).

2. Title 16 U.S.C. § 824a–3(a)(2) directed FERC to prescribe rules which "require electric utilities to offer to purchase electric energy from [qualifying cogeneration and small power production] facilities." In response, FERC mandated that "electric utilit[ies] *shall* purchase, in

16 U.S.C. § 824a–3(f)(1) and 18 C.F.R. § 292.401(a), the State of Oklahoma designated the Corporation Commission as the state regulatory agency responsible for implementing and enforcing PURPA. Title 17 O.S.1981 § 34.1 provided:

> The Commission shall have the power to implement and administer the Public Utility Regulatory Policies Act....

> The Corporation Commission shall adopt such rules and regulations as are necessary to implement the purpose of all federal laws which are administered or enforced by the Corporation Commission.[3]

In 1985, Oklahoma Gas and Electric Company ("OG & E"), a publicly held utility, entered into an Amended Power Sales Agreement ("Contract") with AES Shady Point, Inc. ("AES"). Under the Contract, AES agreed to construct a 500 million dollar coal-fired cogeneration plant in LeFlore County, Oklahoma, and OG & E contracted to purchase all electricity generated by the facility for a period of 17 to 32 years. At the time the Contract was executed, the named appellants in this action were members of the Board of Directors of OG & E. The appellee, Charles D. "Charley" Wilson, is a customer/ratepayer of OG & E.

In accordance with PURPA and Corporation Commission rules, the Contract was submitted to the Commission for approval. After a hearing on September 20, 1985, a hearing officer recommended that the Contract be approved. Among other things, the hearing officer found that the proposed project would "avoid 300 MW [megawatts] of baseload capacity which OG & E would have built to meet the needs of its customers" and that "[a]pproval of the agreement ... will result in direct savings to ratepayers of OG & E of approximately $1,090,-000,000." In other words, according to projections at that time, approval of the Contract would allow OG & E to forego constructing facilities it would otherwise have had to build to meet the predicted electric energy demands of its customers and would save ratepayers an estimated one billion dollars.

On February 27, 1986, the Commission adopted the report of the hearing officer in its entirety and approved the Contract in Order No. 293731. The Commission found that the rates set forth in the Contract were "fair, just and reasonable, are in the best interests of the ratepayers, and are not discriminatory against either AES or OG & E." At the request of AES and acquiescence of OG & E, the Commission waived its Rule 58(H) for purposes of the approval proceeding. Such rule would have required the Contract to contain a provision empowering the Commission to later reopen the Contract, after proper notice and hearing, and alter its terms or otherwise finalize experimental purchase tariffs and special contracts. In the absence of such a "reopener" clause, the initial rates approved by the Commission were locked in for the life of the Contract. The record indicates that AES could not have secured financing for their venture without the Rule 58(H) waiver. As approved, the amounts paid to AES by OG & E under the Contract are passed onto OG & E's Oklahoma retail customers.

Although Commission Order No. 293731 was not appealed, Wilson has twice collaterally attacked the order to no avail. On May 1, 1990, Wilson sought an injunction in LeFlore County District Court to prohibit OG & E and AES from performing under the Contract. He contended that the Commission's waiver of Rule 58(H) was invalid and that the Commission lacked jurisdiction to issue the order due to inadequate notice of the hearing. The district court held the order valid and the Court of Appeals affirmed. *Wilson v. OG & E and AES*, Case No. 78,230 (Okla.Ct.App. Nov. 24, 1992) (unpublished opinion). This Court denied certiorari on March 17, 1993.

accordance with [applicable rate rules], any energy and capacity which is made available from a qualifying facility...." 18 C.F.R. § 292.-303(a) (1984) (emphasis added).

3. Section 34.1 was amended in 1987, but the amendments do not alter the substance of the above quoted provision.

On March 4, 1991, Wilson commenced a proceeding before the Commission in which he sought vacation of the Commission's Order No. 293731. Again, he urged invalidity of the Rule 58(H) waiver and insufficiency of the hearing notice. The Commission dismissed Wilson's application with prejudice and the Court of Appeals affirmed. *Wilson v. Corp. Comm'n.*, Case No. 77,761 (Okla.Ct.App. Nov. 10, 1992) (unpublished opinion). Wilson filed no motion for rehearing or petition for writ of certiorari.

Wilson filed the instant action in Muskogee County District Court on December 19, 1988. He has alleged that the Directors breached a common law fiduciary duty to all Oklahoma ratepayers of OG & E by (1) acquiescing to the Commission's waiver of Rule 58(H), (2) allocating all Contract payments to OG & E's retail Oklahoma ratepayers over the first five years of the Contract, and (3) failing to rescind the Contract when it became apparent that the proposed facility was no longer needed or feasible. Wilson seeks in excess of two billion dollars in damages, which he claims is the amount ratepayers will pay over and above those rates which otherwise would have been paid during the life of the Contract and in the absence of the new facility.

The present suit, as well as Wilson's two previous actions, emanate from OG & E's revelation that the entire burden of the Contract will be borne by Oklahoma ratepayers, while the total production from the AES facility will be transmitted into the State of Arkansas. (Arkansas ratepayers make up some 14% of OG & E's customers). OG & E also announced that the cost to its Oklahoma ratepayers for the venture would be $532,898,000 over and above their ordinary electric bills for the five years commencing in 1991 through 1995. In 1988, OG & E's chief operating officer testified that a number of factors had arisen which made the construction of the plant unfeasible, unnecessary and unneeded. He opined that the company did not need the production from the AES plant, could not use it before the year 2008, and even if needed then such production could be purchased elsewhere at a cheaper price. Finally, in May of 1987, approximately eight months before construction of the AES facility was started, Congress repealed the federal law prohibiting the construction of natural gas-fired plants. Wilson asserts that gas-fired plants can be constructed at one-third the cost of coal-fired plants and that the AES plant is located approximately 25 miles from one of the most prolific natural gas fields in the western world.

After several trial court rulings and interlocutory appeals,[4] the district court granted Wilson's motion to certify and maintain this cause as a class action on behalf of all Oklahoma retail customers/ratepayers of OG & E. On August 11, 1992, the Directors filed this interlocutory appeal urging reversal of: (1) The district court's December 16, 1991, order denying their motion to dismiss for lack of subject matter jurisdiction based upon federal preemption; (2) the district court's July 13, 1992, order determining that this cause be

4. On March 21, 1989, the district court granted the Directors' motion to dismiss for lack of subject matter jurisdiction, holding that this cause was within the exclusive jurisdiction of the Commission. On November 6, 1990, in Case No. 72,951, the Court of Appeals reversed and remanded, holding that the case was not ripe because no payments had been made by OG & E to AES. As of that date, there had been no rate increase to ratepayers which could be the subject of Commission action. The appellate court also rejected the Directors' argument that Wilson's claim was actually a request for a rate refund governed by Commission rules. This Court denied certiorari on March 15, 1991.

After completion of the AES facility and the beginning of payments by OG & E to AES in February of 1991, the Directors filed an amended motion to dismiss for lack of subject matter jurisdiction. The district court denied the motion in orders dated October 4 and 17, 1991. The Directors' motion to dismiss on the grounds that this matter is preempted by PURPA and the Filed Rate Doctrine was denied by the district court on December 16, 1991. On December 23, 1991, the district court certified its October and December orders for interlocutory appeal. The Directors filed with this Court an application to assume original jurisdiction (Case No. 79,192) and a petition for writ of certiorari (Case No. 78,917) to review the district court's orders. On June 11, 1992, we denied both matters without opinion.

certified and maintained as a class action; and (3) the November 6, 1990, opinion of the Court of Appeals in Case No. 72,951.[5]

## ISSUE

The determinative issue in this appeal is whether the district court has subject matter jurisdiction to proceed. We hold that it does not. We conclude that Wilson's petition, as amended, fails to state a claim upon which relief can be granted. Oklahoma does not recognize a common law fiduciary duty on behalf of the Directors to the ratepayers of OG & E. We also find that any such cause of action, if recognized, would be preempted by PURPA and FERC regulations under the facts of this case. Finally, because this matter is essentially a rate refund case, we hold that jurisdiction lies exclusively with the Commission. The district court's July 13, 1992, order is vacated and this case is remanded with instructions to dismiss for lack of subject matter jurisdiction.

## I.

### PROPRIETY OF SUBJECT MATTER JURISDICTION INQUIRY

■ As a preliminary matter, we must address Wilson's argument that the issue of subject matter jurisdiction cannot be raised or addressed in this proceeding. Wilson asserts that this Court's review must be strictly limited to determining whether the prerequisites for class action certification, as set forth in 12 O.S.1991 § 2023, were satisfied in the district court. We disagree. "[W]hether a trial court has jurisdiction over subject-matter of a cause is of primary and fundamental importance and *may be raised at any time.*" *Board of County Comm'rs v. City of Norman,* 472 P.2d 910, 913 (Okla.1970) (emphasis added). *See also Woods Petroleum Corp. v. Sledge,* 632 P.2d 393, 394 (Okla.1981). Furthermore, this Court has a duty to inquire into the jurisdiction of the trial court,

even in the absence of a request by one of the parties. *Dickson v. Dickson,* 637 P.2d 110, 112 n. 2 (Okla.1981). Unlike the previous attempts by the Directors to have this Court address the issue of subject matter jurisdiction, the present interlocutory appeal is brought as a matter of right.[6] *See* 12 O.S.1991 § 993(A)(6). We must therefore inquire into the district court's subject matter jurisdiction at this time.

■ In making the above ruling, we specifically reject Wilson's argument that this Court cannot consider the issue of subject matter jurisdiction because that issue was settled by the Court of Appeals in its November 6, 1990, opinion. *See* note 4. As a general rule, where an appellate court rules upon an issue, that ruling becomes the "law of the case" and controls all subsequent proceedings. However, the "law of the case" doctrine is not controlling "where the facts and issues are different in a subsequent appeal from what they were in the former appeal." *Grand River Dam Authority v. Grand–Hydro,* 200 Okl. 157, 201 P.2d 225, 227 (1947), quoting *Missouri, Kansas & Texas Ry. Co. v. City of Tulsa,* 113 Okl. 21, 238 P. 452, 456 (1925). Furthermore, this Court has held that:

[A]n appellate court may review and reverse its former decision in the same case where it is satisfied that gross or manifest injustice has been done by its former decision, or where the mischief to be cured far outweighs any injury that may be done in the particular case by overruling a prior decision.

*Smith v. Owens,* 397 P.2d 673, 678 (Okla. 1963), and *Grand River Dam Authority,* 201 P.2d at 227, both quoting *Wade v. Hope & Killingsworth,* 89 Okl. 64, 213 P. 549, 551 (1923).

■ The sole basis for the Court of Appeals' conclusion that Wilson's case was not a rate refund action within the exclusive jurisdiction of the Commission was that, as of that date, no increased payments as a result of the Contract had been

---

**5.** *See* case history in note 4.

**6.** All of the Directors' prior filings with this Court were *discretionary* writs. Wilson failed to

recognize this distinction when he specifically declined to address the merits of the subject matter jurisdiction issue in his answer brief.

made by ratepayers to OG & E. In February of 1991, however, OG & E began making payments to AES under the Contract and, in turn, began passing those costs onto its ratepayers. Not until then did Wilson began paying the rates that he claims are excessive and a result of the Directors' wrongdoing. Because of this change of material facts, we hold that the October 6, 1990, opinion of the Court of Appeals does not constitute the "law of the case."

## II.

## WILSON'S COMMON LAW FIDUCIARY DUTY CLAIM

■■■ Wilson's claim is based upon the novel theory that, under Oklahoma common law, the Directors breached a duty of prudent management to OG & E ratepayers, analogous to that owed its shareholders. It is well settled that directors of a corporation owe a fiduciary duty to the corporation and its stockholders under the common law. *See Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939); *McKee v. Interstate Oil & Gas Co.*, 77 Okl. 260, 188 P. 109, 112 (1920). However, we hold that the common law of this state does not impose such a duty with respect to customers/ratepayers of a corporation.

The United States Court of Appeals for the Second Circuit addressed a similar situation in *County of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52 (2d Cir.1984). There, the County of Suffolk, on behalf of all ratepayers of a public utility, sued the utility and others for negligence, breach of contract and warranty, and misrepresentation and concealment relating to the design and construction of a nuclear power plant. Among other things, the court rejected the county's argument that the directors of a public utility owe a fiduciary duty to ratepayers:

> Nor can we adopt appellant's suggestion that LILCO's unique status as a monopolistic-public utility should give rise to a fiduciary responsibility, in accordance with which LILCO would have to act in

the best interests of its customers, not just its shareholders. Such view poses numerous problems, not the least of which is that an artificial fiduciary relationship between LILCO and its ratepayers directly contravenes the fiduciary relationship LILCO already occupies with respect to its shareholders.

*Id.* at 63.

We find that *County of Suffolk* delineates the correct law regarding the issue raised herein. The appellees, as directors of a publicly held corporation, already owe a fiduciary duty to OG & E and its stockholders. As was true in *County of Suffolk*, any artificial relationship between OG & E and its ratepayers would directly contravene that existing fiduciary duty.

We acknowledge that *Hargrave v. Canadian Valley Elec. Co-op.*, 792 P.2d 50, 57 (Okla.1990), recognized a fiduciary duty on the part of the trustees of a rural electric distribution cooperative ("REC") to its ratepayers. However, *Hargrave* is clearly distinguishable from the case at bar, which concerns a corporation rather than a cooperative. Unlike the ratepayers of OG & E, the ratepayers of an REC are its members and have statutorily authorized voting rights. 18 O.S.1991 § 437.7. In the case of an REC, there is no one other than the ratepayers/members to whom the trustees can owe a fiduciary duty. Finally, the ratepayers/members of a cooperative occupy a position of ownership analogous to the ownership of a corporation by its stockholders. The ratepayers of OG & E do not occupy the position of ownership and control that is enjoyed by ratepayers/members of an REC. No fiduciary duty is owed OG & E ratepayers by the Directors.

## III.

## FEDERAL PREEMPTION

■■■ Even if this State did recognize the common law cause of action which Wilson presses in this case, we would find that such action is preempted by federal law. The preemption doctrine arises from the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI, cl. 2, and

"invalidates any state law that contradicts or interferes with an Act of Congress." *Missouri–Kansas–Texas R. Co. v. State*, 712 P.2d 40, 47 (Okla.1985). A state law is invalid, *inter alia*, to the extent that it "actually conflicts with a ... federal statute," *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978), or when it " 'stands as an obstacle to the accomplishment and execution of the full purpose of Congress.' " *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985), quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). This Court has defined these two examples of preemption as where "an actual conflict between state and federal laws mak[es] it physically impossible to comply with both; or ... where the objectives and purpose of Congress are thwarted by state law." *Todd v. Frank's Tong Service, Inc.*, 784 P.2d 47, 49 (Okla.1989). The United States Supreme Court has "also recognized that 'a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation' and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law." *City of New York v. F.C.C.*, 486 U.S. 57, 63–4, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988), quoting *Louisiana Public Service Comm'n v. F.C.C.*, 476 U.S. 355, 369, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986).

PURPA was enacted to encourage utility companies to purchase energy from qualifying cogeneration and small power production facilities. As previously set forth, FERC rules require such purchases. *See* note 2. A cogenerator is entitled to receive for its electricity the utility's "full avoided cost."[7] 18 C.F.R. § 292.304(a)(1), (b)(2). A utility's full avoided cost is "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another

source." 16 U.S.C. § 824a–3(d). *See also* 18 C.F.R. § 292.101(b)(6). By setting the rate at full avoided cost, FERC recognized that a utility's ratepayers might not receive a direct economic benefit from the utilization of cogenerated energy. Rather, " 'ratepayers and the nation as a whole will benefit from the decreased reliance on scarce fossil fuels, such as oil and gas, and the more efficient use of energy.' " *American Paper Inst., Inc. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 406–07, 103 S.Ct. 1921, 1924–25, 76 L.Ed.2d 22 (1983), quoting 45 Fed.Reg. 12,222 (1980). *See also FERC v. Mississippi*, 456 U.S. 742, 746, 750, 756–758, 102 S.Ct. 2126, 2130, 2132, 2135–36, 72 L.Ed.2d 532 (1982).

FERC regulations also grant cogenerators the right to negotiate a long-term purchase contract with the price of the power to be purchased based on the avoided costs of the utility calculated at the time of delivery or at the time the obligation is incurred. 18 C.F.R. § 292.304(d). Should a cogenerator choose the latter method of calculation, it has the right to receive the benefits of the contract even if, due to changed circumstances, the contract price for the power at the time of delivery is unfavorable to the utility. 18 C.F.R. § 292.304(b)(5), (d)(2). FERC recognized that such regulations might result in a "purchasing utility ... be[ing] required to pay a rate for purchases that would subsidize the [cogenerator] at the expense of the utility's other ratepayers." 45 Fed.Reg. 12,224 (1980). However, FERC concluded that this was appropriate in order "to ensure that a [cogenerator] which has obtained the certainty of an arrangement is not deprived of the benefits of its commitment as a result of changed circumstances." *Id.*

On this basis, we hold that any common law fiduciary duty imposed upon the Directors which required them to rescind the Contract would directly conflict with PURPA and FERC regulations, thereby

---

**7.** Under certain circumstances, a state can set rates that are lower than full avoided costs. 18 C.F.R. § 292.304(b)(3). Also, a qualifying facility and a utility can negotiate for lower rates,

§ 292.301(b)(1), and a state regulatory authority or any non-regulated utility may apply to FERC for a waiver, § 292.403.

making it impossible to comply with both. The Directors could not comply with federal mandates to honor long term, fixed rate contracts with cogenerators, while at the same time being required to rescind any such contract which, due to changed circumstances, became undesirable to ratepayers. Imposing such a fiduciary duty would thwart the objectives and purpose of Congress. PURPA was enacted to encourage electric utilities to purchase energy from cogenerators. To hold the Directors to the duty proposed by Wilson, and subject them to civil penalties for a breach thereof, would certainly stand as an obstacle to the accomplishment and execution of the full purpose of Congress as expressed in PURPA and implemented by FERC regulations.

We do not hold that all state laws governing contracts between electric utilities and cogenerators are preempted by federal law. Our holding is strictly limited to the claims, facts and regulations discussed herein. Accordingly, we conclude that Wilson's proposed cause of action is preempted by PURPA and FERC regulations.

## IV.

### RATE REFUND ACTIONS

■ The Directors also argue that the district court lacks subject matter jurisdiction of this action because it is simply another collateral attack upon prior Commission orders and constitutes an impermissible action for a rate refund. We agree. Although Wilson's petition is styled as negligence and/or intentional tort action and request for money damages, it is apparent that Wilson's goal is to recover for ratepayers the increased rate payments occasioned by the execution of the Contract. Wilson's damage claim figure demonstrates his true intent. In his original Petition, Wilson prayed for $532,898,000 in damages. As Wilson asserted in his Petition, that figure is the exact amount of "[t]he costs of the AES contract to OG & E's customers and ratepayers as projected [and] publicly announced by OG & E. . . ." After discovering that the foregoing figure represented

only the costs associated with the first five years of the Contract, Wilson filed a Notice of Intent to Request Permission to Amend Petition, wherein he contends that the ultimate loss suffered over the 17–32 year life of the Contract will exceed two billion dollars.

In *Continental Tel. Co. of Oklahoma v. Hunter,* 590 P.2d 667 (Okla.1979), this Court confronted a situation analogous to the present case. The subscribers to telephone service sued the defendant telephone company in district court for breach of contract for interrupted service. The plaintiffs sought damages in an amount identical to the sum of refunds due for the service not given during the period involved. We characterized the subscribers' claim as an attack upon the adequacy of the service rendered and held that such a refund/reparation action was within the exclusive jurisdiction of the Commission. Particularly compelling is Justice Opala's specially concurring opinion, wherein he stated:

> [W]henever a tribunal is called upon to determine whether utility-rendered service has earned the full charges lawfully prescribed therefor, less than the fixed legal rate or nothing at all, the *issue presented requires an exercise of rate-making authority* which lies exclusively in the commission. As our Constitution clearly commands, the commission's exercise of rate-making authority may never be "questioned" anywhere else except on regular review prescribed by law.

*Id.* at 670 (Opala, J., concurring specially) (emphasis in original).

"The character of an action is determined by the nature of the issues made by the pleadings and the rights and remedies of the parties, and not alone by the form in which the action is brought or by the prayer for relief." *Comstock v. Little,* 359 P.2d 704, 709 (Okla.1961), quoting *Green v. Correll,* 133 Okl. 94, 271 P. 241 (1928). After examining the nature of the issues raised in Wilson's petition, and the rights and the remedies of the parties involved, we conclude that Wilson's claim is in actuality an action for a refund of rates which

he claims are excessive. Those rates were established by the Contract and approved by the Commission. As such, the Commission is vested with exclusive jurisdiction over this matter. Okla. Const. art. IX, § 18; 17 O.S.1991 § 121 et seq. The present suit constitutes an impermissible collateral attack upon the Commission's order approving the Contract.

### CONCLUSION

We recognize no common law fiduciary duty on behalf of the Directors to the ratepayers of OG & E. Therefore, Wilson's petition fails to state a claim upon which relief can be granted. If such a duty did exist, it would be preempted by PURPA and FERC regulations. Furthermore, because this case is essentially a rate refund case, jurisdiction lies with the Commission and this case is an impermissible attack upon the Commission's order approving the Contract.

The order of the district court certifying this cause as a class action and authorizing maintenance as a class action is VACATED. This case is REMANDED to the district court with instructions to DISMISS for lack of subject matter jurisdiction.

HODGES, C.J., and SIMMS, OPALA and SUMMERS, JJ., concur.

LAVENDER, V.C.J., and WILSON, J., concur in result.

KAUGER, J., concurs in part, dissents in part.

HARGRAVE, J., dissents.