*1025 OPINION OF THE COURT
Jay Stuart Dankberg, J.
While the art of dancing has been called "the source of all the arts that express themselves first in the human person”, "the art of building, or architecture, is the beginning of all the arts that lie outside the person” (Havelock Ellis, The Dance of Life, ch 2).
Architects have been described as being "like poets who transmute nature’s message into song” (Samuel Eliot Morison, The Oxford History of the American People, ch 36).
After all, as American historian William Hickling Prescott keenly observed: "the surest test of the civilization of a people * * * is to be found in their architecture, which presents so noble a field for the display of the grand and beautiful, and which, at the same time, is so intimately connected with the essential comforts of life” (The Conquest of Peru, book I, ch 5).
The issues in this litigation will be resolved upon a determination whether plaintiff performed "interior design” services or whether, as unlicensed architects, plaintiff’s officers and employees engaged in the improper practice of "architecture” (as defined by Education Law § 7301).
These issues are raised by a motion by defendants for an order granting them summary judgment regarding the complaint and their fifth counterclaim and a cross motion by plaintiff for an order awarding it summary judgment on the complaint and also dismissing defendants’ counterclaims. The motion and cross motion are consolidated for decision.
While the court’s research has uncovered many decisions over the years interpreting Education Law § 7301 (including one published just a few weeks ago — El-Siginy v Assadi, NYLJ, Dec. 3, 1987, at 14, col 2 [Sup Ct, NY County, McCooe, J.]), in none of the reported decisions has the alleged unlicensed architect sought refuge behind the alias of "interior designer”.
This, then, is a case of apparent first impression in such regard.
INTERIOR DESIGN V ARCHITECTURE
Perhaps as good a working definition as any expressing what constitutes "interior design” has been given in this case by affidavit of Harry M. Schule, plaintiff’s president. At paragraph 1, he outlines his "area of work” as being "concerned *1026 with design, lay-outs, arrangements and choices of colors, fabrics, furniture accessories and other decorations.”
By legislative enactment, Education Law § 7301 defines "[t]he practice of the profession of architecture * * * as rendering or offering to render services which require the application of the art, science, and aesthetics of design and construction of buildings, groups of buildings, including their components and appurtenances and the spaces around them wherein the safeguarding of life, health, property, and public welfare is concerned. Such services include, but are not limited to consultation, evaluation, planning, the provision of preliminary studies, designs, construction documents, construction management, and the administration of construction contracts.”
Certainly, then, there is a thin — but plain — line between "interior design” and "architecture” services.
In these submitted papers, it has been amply demonstrated by both sides that plaintiff has crossed over this line in more than one respect. This "crossing over” impels the court to find in this case that plaintiff has improperly engaged in the unlicensed practice of architecture.
SUMMARY JUDGMENT
As a rule, in determining a motion for summary judgment, the court’s function is limited to the ascertainment of the existence of any issues of material fact in the proofs laid bare by the parties’ submissions of affidavits based on personal knowledge and documentary evidence, rather than in their conclusory or speculative averments. The court makes no discretionary examination of such fact issues, nor does it resolve them (compare, Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067-1068 [1979]; Mallad Constr. Corp. v County Fed. Sav. & Loan Assn., 32 NY2d 285, 290 [1973]; Mintz v Long Is. Daily Press Publ. Co., 75 AD2d 595 [2d Dept 1980]; Esteve v Abad, 271 App Div 725, 727 [1st Dept 1947] [Rules Civ Prac 113, now CPLR 3212], with Bishop v Galasso, 67 AD2d 753 [3d Dept 1979]; Cohen v Levy, 50 AD2d 1039 [3d Dept 1975] [CPLR 5015]; Sortino v Fisher, 20 AD2d 25, 31-33 [1st Dept 1963] [CPLR 3216]; Mintzer v Loeb, Rhoades & Co., 10 AD2d 27, 29, lv denied 10 AD2d 911 [1st Dept 1960] [Rules Civ Prac 302, now CPLR 3216]).
In opposing a motion for summary judgment, a party is required to assemble, lay bare and reveal all proof in order to *1027 show that its claims are real and capable of being established upon a trial (Indig v Finkelstein, 23 NY2d 728 [1968]).
Although summary judgment may not be granted where the existence of a triable question of fact is in doubt or even arguable (Terranova v Emil, 20 NY2d 493 [1967]; Falk v Goodman, 7 NY2d 87, 91 [1959]), " '[a] shadowy semblance of an issue is not enough to defeat the motion’ ” (De Groes v De Groes, 17 AD2d 930 [1st Dept 1962]). " 'Bald, conclusory assertions, even if believable, are not enough’ ” (Ehrlich v American Moniger Greenhouse Mfg. Corp., 26 NY2d 255, 259 [1970]).
Here, the assertion by plaintiff’s president (several times) of the bald, conclusory statement that the services performed were not those of an "architect” since they "do not constitute the practice of architecture” does not suffice to defeat the application by defendants. Certainly, and especially without an affidavit from a licensed architect, plaintiff’s presently asserted self-serving statements are nothing more than mere shadows which in no way impeach the various documents and activities that have taken place since 1984.
The January 17, 1984 "letter of agreement” describes the scope of the "first phase” of plaintiff’s work as including: "floor plans, elevations, architectural drawings, along with furniture layouts, color schemes, fabric selections, wallcoverings, curtain and window designs, floor coverings * * * The first phase of work will be designs for all of the architectural work to be done — new kitchen, two new bathrooms (including electrical and plumbing), the redesign of closets, the addition of any cabinetry (bookcases, etc.), and any changes in walls and openings; for all of which we will supply a general contractor which we will supervise. The second phase will be the decoration — furniture and as above” (emphasis added).
The architectural design work described in this "letter of agreement”, including the supplying and supervision of a general contractor, falls under the very clear language of Education Law § 7301: "[s]uch services include, but are not limited to consultation, evaluation, planning, the provision of preliminary studies, designs * * * construction management, and the administration of construction contracts.”
This "letter of agreement” alone is certainly far beyond the practice of "interior design”, even as defined by plaintiff’s president.
In fact, even in his affidavit in opposition, plaintiff’s presi *1028 dent does damage to plaintiffs cause by claiming that defendant Joy Goldman retained plaintiff "to perform design and decorating services, including the re-arrangement of doors and closets” (emphasis supplied). Such is the type of activity the Legislature had in mind in enacting section 7301 of the Education Law.
Also proscribed is the providing of the "more than 40” detailed architectural-type drawings supplied by plaintiff without the aid of a licensed architect.
Plaintiff argues that defendant Joy Goldman "never advised plaintiff and/or its principals that she 'intended to have an architect do the drawings and designs for the structural alterations’ ”. Such argument is in error in placing the burden upon the party who wants to have work performed.
As soon as it became apparent that structural work was to be done, the burden immediately was upon plaintiff and its principals — since they are not licensed architects — to refuse to prepare architectural designs and drawings for such structural work. The burden thus upon plaintiff and its principals is not a draconian obligation — as someone involved in the field of "interior design” for "over twenty-two years”, Mr. Schule and his associates should be reasonably prudent professionals providently preparing proper practical plans preventing potential application of Education Law § 7301.
It has been held that "the preparation of plans and the supervision of construction work * * * are the usual functions of an architect” (American Store Equip. & Constr. Corp. v Dempsey’s Punch Bowl, 174 Misc 436, 437 [Sup Ct, NY County 1939], affd 258 App Div 794 [1st Dept 1939], affd 283 NY 601 [1940]).
PUBLIC PURPOSE
"The legislative intent is an important consideration in determining whether a violation of the statute should render the contract void or merely mandate a penalty” (Zimmett v Professional Acoustics, 103 Misc 2d 971, 974 [App Term, 1st Dept 1980]).
Where the purpose of the regulatory scheme in requiring a license to install air conditioning was to protect the public health and safety, lack of a license was held to bar recovery for work performed (Richards Conditioning Corp. v Oleet, 21 NY2d 895 [1968]).
Licensing requirements which protect the public health and *1029 safety must be strictly complied with and a contract in violation of such statutes cannot be enforced (Millington v Rapoport, 98 AD2d 765 [2d Dept 1983]; Matter of Schwartz [American Swim Pools], 74 AD2d 638 [2d Dept 1980]; George Piersa, Inc. v Rosenthal, 72 AD2d 593 [2d Dept 1979]; Wineman v Blueprint 100, 75 Misc 2d 665 [Civ Ct, NY County 1973, Blyn, J.]).
The profession of architecture involves "the safety and lives of the general public” (American Store Equip. & Constr. Corp. v Dempsey’s Punch Bowl, 174 Misc 436, 437, supra). "The obvious and avowed purpose of those sections [7201 and 7302] of the New York Education Law is to safeguard the life, health and property of residents of New York” (Vereinigte Osterreichische Eisen und Stahlwerke, AG. v Modular Bldg. & Dev. Corp., 64 Misc 2d 1050, 1051 [Sup Ct, NY County 1970, Greenfield, J.]).
Here, plaintiff’s president testified at a pretrial deposition (and repeated several times in his two submitted affidavits) that plaintiff is a firm that provides interior design services; he claims that neither plaintiff nor its principals (and one additional employee) ever held themselves out to be architects. It is thus undisputed that plaintiff, its principals and employees are not licensed architects.
In this factual setting, it is also undisputed that plaintiff never hired any licensed architect as an employee, aide or consultant nor to prepare plans (see, e.g., Vereinigte Osterreichische Eisen und Stahlwerke, AG. v Modular Bldg. & Dev. Corp., supra).
Yet, the language in the "letter of agreement” and the various services performed (e.g., over 40 architectural-type drawings) and to be performed (e.g., rearrangement of doors and closets, supervision of a general contractor) describe activities and services normally rendered by an architect. A licensed architect was here required. In agreeing to perform such activities and provide such services without aid of a licensed architect, plaintiff violated sections 7301 and 7302 of the Education Law (§ 7302: "[o]nly a person licensed or otherwise authorized to practice under this article shall practice architecture or use the title 'architect’ ”).
It is determined that, because of the violation of section 7301, the underlying contract between the parties is based upon an illegal bargain, is contrary to public policy, and is invalid. "If any part of the consideration for [a] contract was *1030 contrary to public policy, the whole promise fails” (Metz v Woodward-Brown Realty Co., 182 App Div 60, 65 [2d Dept 1918]).
Moreover, "[s]ince Educ. Law, section 7302 prescribes that 'only a person licensed or otherwise authorized . . . shall practice architecture . . .’ no recovery for fees is available to plaintiff as an unlicensed architect” (El-Siginy v Assadi, supra, NYLJ, Dec. 3, 1987, at 14, col 2).
Plaintiff cannot recover for nonarchitectural services it may have already performed — and certainly not for portions of the contract involving architectural services — since "the contract was entire and indivisible; to plan, construct and furnish a complete unit” (American Store Equip. & Constr. Corp. v Dempsey’s Punch Bowl, 174 Misc 436, 437, supra).
If plaintiff, or its officers, agents or employees — presently interior designers (a noble profession) — desire to perform architectural services (the practice of what is also a noble profession) and earn the additional fees engendered thereby, let plaintiff either hire a licensed architect or have its individuals go through the vigorous licensing procedures prescribed by the State of New York (as a corporation, of course, plaintiff itself "could not, in fact, be licensed” — American Store Equip. & Constr. Corp. v Dempsey’s Punch Bowl, 174 Misc 436, supra; Education Law § 7302).
Such procedure was not followed by plaintiff here — the defect is fatal to plaintiff’s cause.
Based upon the above, summary judgment is granted to defendants dismissing the plaintiff’s complaint and awarding judgment to defendants on their fifth counterclaim (seeking recovery of the $10,000 retainer paid to plaintiff in 1984).
However, defendants have not demonstrated that the two individuals named as "counterclaim defendants” are individually liable with respect to the counterclaims. It is noted that plaintiff is also called a "counterclaim defendant” at paragraph 7 of the answer (yet not so described in the caption of this action).
Therefore, the cross motion by plaintiff is granted to the extent of dismissing the counterclaim as to the individuals named as "counterclaim defendants” only; otherwise denied.
Settle order.
Copies of the proposed order and the actual order when signed are also to be served upon the Office of the District Attorney, New York County, and the Attorney-General of the *1031 State of New York so that such public officials may take such action as is required and which they, in their official discretion, believe warranted to insure that there be future compliance with Education Law §§ 7301 and 7302 by plaintiff.
This case illustrates the accuracy of German poet Johann von Goethe in writing: "the fate of the architect is the strangest of all. How often he expands his whole soul, his whole heart and passion, to produce buildings into which he himself may never enter” (Elective Affinities, book II, ch 2 [1808], translated by James Anthony Froude).