**Peter T. JOSEPH, Plaintiff–Counterclaimant–Defendant,**

v.

**DAVID M. SCHWARZ/ARCHITECTURAL SERVICES, P.C. and David M. Schwarz, Defendants–Counterclaimants.**

**No. 92 Civ. 2043 (CSH).**

United States District Court, S.D. New York.

Feb. 20, 1997.

Gandolfo V. DiBlasi, Sullivan & Cromwell, James E. Frankel, Shea & Gould, and Kenneth H. Lazaruk, Baer Marks & Upham, New York City, for Peter T. Joseph.

Jonathan Geldzahler, Wright, Robinson, McCammon, Osthimer & Tatum, Washington, DC and Paul R. Grand, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, for Architectural Services, P.C. and David M. Schwarz.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

This case is before the court on cross-motions for partial summary judgment. For reasons stated below, defendants' motion for summary judgment is granted as to plaintiff Peter Joseph's claims for negligence against both defendants, and for breach of contract against defendant David Schwarz. The cross-motions for summary judgment on the counterclaim brought by defendant David M.

Schwarz/Architectural Services, P.C. ("ASPC") are both denied.

## BACKGROUND

This diversity action follows in the wake of an agreement between Joseph, a New York resident, and ASPC, a professional corporation licensed to practice architecture in the District of Columbia and Texas, for design and construction of a duplex apartment. Defendant Schwarz is ASPC's sole shareholder.

The parties do not dispute the following facts:

In the Spring of 1989, Joseph purchased an undeveloped space on the thirty-ninth and fortieth floors of 500 Park Avenue ("3940"), which he sought to prepare for use as a family residence. Joseph hired ASPC to work on the project, and by letter dated February 2, 1989, ASPC set forth the terms of its employment. Schwarz Aff. ex. 3 ("the Letter Agreement"). ASPC signed the letter "by: David M. Schwarz," and Joseph signed the document under the heading "accepted." *Id.*

In the Letter Agreement, ASPC stated that it would provide Joseph with "design services" for the 3940 project, including development of schematic plans. Under the agreement, after the plans were approved by Joseph, ASPC would "work with" Joseph's mechanical and structural engineers to complete construction drawings. *Id.* ¶ 2. The corporation was to be paid on a "time and materials basis," and was to submit invoices every month detailing the costs of its work. *Id.* ¶ 3.

The Letter Agreement confirmed the parties' understanding that ASPC was not licensed in New York, and stated that Joseph would furnish "[a]ny requisite of New York law for licensed professional services." *Id.* ¶ 4. Joseph also agreed to retain various licensed engineers with responsibility for producing structural and other drawings and "any other consultants required by either law or the requirements of the project." *Id.* ¶ 6. ASPC, for its part, stated that it would assist Joseph in locating the requisite "consultants," help coordinate their work, and "pro-

duce construction drawings" as Joseph deemed necessary. *Id.*

ASPC commenced work on the project, but differences surfaced between the parties about the manner in which that work was performed. In the Summer or Fall of 1990, Joseph informed Schwarz that he would no longer make payments to ASPC until certain problems with the project were remedied.[1] ASPC continued to work on 3940 without payment until it was terminated by Joseph on February 8, 1991.

Joseph then commenced the instant action, and subsequently amended his pleadings. In the amended complaint, he asserted causes of action for breach of contract, negligence and unjust enrichment. The contract claim was based on a number of purported deficiencies in ASPC's performance of its contractual obligations, including failure to timely develop the construction documents, to supervise and manage employees, and to administer the project in a professional manner. Amended Complaint ¶ 39. The tort claim alleged that ASPC had breached its duty to use reasonable professional skill, as evidenced by many of the same failings cited in the contract claim.

ASPC responded by filing a counterclaim for breach of contract and quantum meruit.[2] Specifically, ASPC alleged that it was owed an outstanding balance of over $500,000 for services rendered and expenses incurred on the 3940 project. ASPC now moves for summary judgment on the counterclaim, asserting that there is no dispute about the following: Joseph contracted with ASPC to work on 3940; ASPC performed the work for which it now seeks payment; and Joseph did not provide ASPC with the requisite compensation. *See* Defendants' Mem. in Further Support at 2. Joseph also seeks summary judgment on the counterclaim, arguing that ASPC's unlicensed status prohibits it from gaining any such recovery. Joseph maintains, in the alternative, that there are numerous factual disputes regarding ASPC's performance.

Additionally, defendants seek summary judgment on Joseph's negligence claim on the ground that a tort action of this nature may not be brought solely for economic damages. Finally, defendants challenge Joseph's breach of contract claim against Schwarz, contending that he was not a party to the Letter Agreement.

## DISCUSSION

Under Fed.R.Civ.P. 56, the moving party is entitled to summary judgment if the papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On such a motion, "a district court must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party." *Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 382 (2d Cir.1996).

The responding party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The non-movant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' ... or defeat the motion through 'mere speculation or conjecture.'" *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (citations omitted). The parties in this case appear to agree that the law of New York, where the events at issue took place, governs the substantive legal disputes presented by these motions.

## I. Breach of Contract Claim Against Schwarz

■ Defendants seek dismissal of the breach of contract claim brought against Schwarz personally. They argue that Schwarz cannot be held liable for an agreement entered into by ASPC.

■ It is a longstanding principle of New York law that an agent acting on behalf of a disclosed principal does not personally bind himself unless there is "clear and explic-

---

1. The defendants maintain that Joseph conveyed this intention in the Fall, Defendants' 3(g) Statement ¶ 54, while Joseph places this conversation in the Summer. Response ¶ 54.

2. ASPC brought the counterclaim alone; Schwarz is not named therein.

it" evidence of his intent to do so. *See Lerner v. Amalgamated Clothing and Textile Workers Union,* 938 F.2d 2, 5 (2d Cir.1991); *Salzman Sign Co. v. Beck,* 10 N.Y.2d 63, 217 N.Y.S.2d 55, 57, 176 N.E.2d 74, 76 (1961). Thus, a corporate shareholder or officer who signs an agreement on the corporation's behalf is not bound thereby absent manifest intent to create individual liability, *Salzman,* 217 N.Y.S.2d at 57, 176 N.E.2d at 76, or an applicable statutory exception to this rule, *We're Assocs. Co. v. Cohen, Stracher & Bloom, P.C.,* 103 A.D.2d 130, 478 N.Y.S.2d 670, 673 (2d Dep't 1984), *aff'd,* 65 N.Y.2d 148, 490 N.Y.S.2d 743, 480 N.E.2d 357 (1985).

In *Salzman,* no individual liability was found to attach, although the contract at issue contained a clause in which the signatory officers personally guaranteed payment. *See* 217 N.Y.S.2d at 56, 176 N.E.2d at 75–76. The New York Court of Appeals found the provision to lack the requisite clarity. *Id.* at 57–58, 176 N.E.2d at 76. The instant case presents an even weaker basis for individual liability than that rejected *Salzman.* Nothing in the Letter Agreement hints at any intent on Schwarz's part to take on this burden. Furthermore, the contract was signed by ASPC "[b]y: David M. Schwarz." In using the term "by," Schwarz indicated that he was merely serving as the corporation's agent. *See Lerner,* 938 F.2d at 6 (by using word "by," the signatory "signed an agreement on behalf of [the corporation] . . . and not on behalf of himself as an individual").

■ Joseph contends that New York Business Law § 1527 has expanded shareholder liability, in the professional services context, beyond that set forth in the caselaw cited above. Section 1527 provides, in pertinent part:

Each shareholder, employee or agent of a foreign professional service corporation who performs professional services in this state on behalf of the corporation shall be personally and fully liable and accountable for any negligent or wrongful act or misconduct committed by him or by any person under his direct supervision and control while rendering such professional services, and shall bear professional responsibility for compliance by such corporation with all laws, rules and regulations governing the practice of the profession in this state.

The defendants argue that this statute applies only to tort, and not to breach of contract claims. On the face of the statute, the defendants are correct. An individual shareholder has not committed or directly supervised a "wrongful act or misconduct" when the corporation in which he owns stock breaches an agreement. The party responsible for carrying out that agreement was the corporation itself, regardless of which individual was the signatory on its behalf.

The primary New York decision which addresses this issue, *We're Associates,* is fully in accord with this position. In that case, the plaintiffs sought to impose personal liability on individual shareholders for a corporation's failure to meet its obligations under a lease agreement. The plaintiffs relied for this proposition on Business Corporation Law § 1505, the analogue to § 1527 for domestic professional corporations. The substance of the two statutes is identical in all material respects.

The Appellate Division held that the defendants were not individually liable. It found that the statutory provisions at issue here were not intended to exempt professional service corporations from the general principle of limited corporate liability. 103 A.D.2d 130, 478 N.Y.S.2d 670, 673 (2d Dep't 1984). Rather, Section 1505 "is simply a reflection of the common law rule that a shareholder is liable for those *torts* of the corporation in which he is a participant." *Id.* 478 N.Y.S.2d at 673–74 (emphasis added). In support of its conclusion, the court cited the following commentary: "In a professional corporation . . . liability for contractual obligations is strictly limited to the assets of the Corporation; provided, of course, that no attorney-stockholder personally guarantees the Corporation's obligations." *Id.* at 674 (*citing* Rotgin, *The Professional Corporation for Lawyers,* 52 N.Y.S.B.J. 634, 634–35).

The Court of Appeals affirmed the Appellate Division's ruling. It found the imposition of personal shareholder liability to be improper when alleged misdeed did not in-

volve "the direct rendition of professional services." 490 N.Y.S.2d at 745, 480 N.E.2d at 359. Limited liability, in the Court's words, "cannot be defeated by a liberal construction which would include ordinary business debts within the definition of professional services." *Id.* I see no reason why this holding should not preclude the present attempt to impose contractual liability on an individual shareholder of a professional corporation without the shareholder's express agreement. *See Tannenbaum v. Reichenbaum & Silberstein, P.C.*, 226 A.D.2d 700, 642 N.Y.S.2d 43, 44 (2d Dep't 1996) (individual defendants not liable for breach of agreement by professional corporation). In seeking to impose personal liability on Schwarz for the failure of ASPC to comply with the terms of a contract it entered into, Joseph is asking this Court to adopt the statutory construction rejected in *We're Associates.* Because neither the terms of the statute nor New York caselaw allow for such a result, I grant the defendants' motion for summary judgment on the breach of contract claim brought individually against Schwarz.

## II. Joseph's Negligence Claim

■ Defendants maintain that Joseph cannot sustain his negligence claim because he only seeks damages for pecuniary loss. They cite *County of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 62 (2d Cir.1984), for the proposition that, under New York law, "a negligence action seeking recovery for economic loss will not lie." [3] Joseph does not dispute defendants' characterization of the damages he is seeking, Plaintiff's 3(g) Response ¶ 65; he contends, however, that the general New York rule set forth in *County of Suffolk* does not apply where the suit seeks recovery for negligent performance of a contract for services. Plaintiff's Mem. at 58–59.

While New York law does allow for certain exceptions to the blanket rule cited by the defendants, I do not find those exceptions sufficiently broad to accommodate the tort claim advanced by plaintiff, and I therefore grant defendants motion for summary judgment on this issue.

■ The questions raised by defendants' motion traverse boundaries land between contract and tort, and have therefore been the subject of confusing and sometimes contradictory rulings by the federal and New York courts. In fact, two distinct issues are implicated by the matter at hand: First, because "merely charging a breach of a 'duty of due care' does not, without more, transform a simple breach of contract into a tort claim," a legal duty independent of contract must be alleged before the tort claim will lie. *Clark–Fitzpatrick v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 657, 516 N.E.2d 190, 194 (1987). Second, the nature of the injury alleged must be of the kind typically redressed in tort before a plaintiff may go forward with a negligence action; where "plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 583 N.Y.S.2d 957, 961, 593 N.E.2d 1365, 1369 (1992). Although some decisions appear to conflate these issues, *see Bd. of Educ of Hudson City School Dist. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 523 N.Y.S.2d 475, 517 N.E.2d 1360 (1987) ("*Sargent*"), the Court of Appeals made clear in *Sommer* that these are entirely distinct "guideposts." 583 N.Y.S.2d at 961, 593 N.E.2d at 1369. Both of these criteria, duty and appropriate damages, must be met before a contracting party may proceed on a negligence claim. *See Carmania Corp., N.V. v. Hambrecht Terrell Int'l*, 705 F.Supp. 936, 938 (S.D.N.Y.1989) (*Clark–Fitzpatrick* rule is "only one of the dikes New York courts have erected to keep contract and tort claims separate"—the requirement that the damages alleged be of the kind remediable in tort is another).

■ Joseph may be able to surmount the first of these obstacles. A duty independent of contract may arise out of a professional obligation to act with reasonable care. *Sommer*, 583 N.Y.S.2d at 961, 593 N.E.2d at

---

**3.** "Economic damage" or pecuniary harm refers to damages not involving "physical damage to person or property resulting from an accidental cause." *Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.*, 725 F.Supp. 656, 665 n. 6 (N.D.N.Y.1989) (citation omitted).

1369. Architects are subject, under New York law, to such an extra-contractual obligation. *See Carmania Corp.,* 705 F.Supp. at 937; *Consolidated Edison Co. v. Westinghouse Elec. Corp.,* 567 F.Supp. 358, 364 (S.D.N.Y.1983) (architects represent "typical case" of contracting party that may be sued in negligence arising out of common law duty to exercise reasonable care); *but see Sargent,* 523 N.Y.S.2d at 478, 517 N.E.2d at 1363–64 (no legal duty independent of contract when architect's allegedly defective design resulted in only pecuniary damages). Joseph stumbles, however, at the second "guidepost" set forth in *Sommer.*

Where a contract concerns provision of a service, rather than the sale of goods, some courts have found an exception to the general rule that a suit seeking only pecuniary damages will not state a claim for negligence. *See MCI Telecommunications Corp. v. John Mezzalingua Assocs.,* 921 F.Supp. 936, 945 (N.D.N.Y.1996); *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.,* No. 88–cv–819, 1992 WL 121726, at *23 (N.D.N.Y. May 23, 1992); *Consolidated Edison,* 567 F.Supp. at 364; *AT & T Information Sys., Inc. v. Mc Lean Bus. Svcs., Inc.,* 175 A.D.2d 652, 572 N.Y.S.2d 582, 583 (4th Dep't 1991); *Word Mgmt. Corp. v. AT & T Information Sys., Inc.,* 135 A.D.2d 317, 525 N.Y.S.2d 433, 435 (3rd Dep't 1988). In a similar vein, other courts have carved out such an exception in cases where the complaint is alleging professional malpractice. *See Robinson Redevelopment Co. v. Anderson,* 155 A.D.2d 755, 547 N.Y.S.2d 458, 460 (3rd Dep't 1989) (suit against architect); *see also Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.,* 725 F.Supp. 656, 665–66 (discussing malpractice exception, without deciding its validity). Furthermore, in cases where only economic damages were at stake, both the New York Court of Appeals and the Second Circuit have found that claims for negligent performance of a contract and breach of that contract can be presented side-by-side. *See William Wrigley Jr. Co. v. Waters,* 890 F.2d 594, 602 (2d Cir.1989) ("It is well settled under New York law that negligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract"); *Ajax*

*Hardware Mfg. v. Industrial Plants Corp.,* 569 F.2d 181, 185 (2d Cir.1977) (citations omitted) (these two claims "may be submitted to a jury as a matter of both New York substantive law and federal procedural law"); *Sears, Roebuck & Co. v. Enco Assocs., Inc.,* 43 N.Y.2d 389, 401 N.Y.S.2d 767, 769, 372 N.E.2d 555, 556 (1977) (owner may recover against architect, in action arising out of contractual relationship, "either on the theory of breach of a particular contract provision or on the theory of failure to exercise due care in the performance of contract services"); *Paver & Wildfoerster v. Catholic High School Ass'n,* 38 N.Y.2d 669, 382 N.Y.S.2d 22, 25, 345 N.E.2d 565, 568 (1976) ("when the action is one for damages to property or pecuniary interests only, where there is a contractual agreement between the parties, the general tendency has been to allow the plaintiff to elect to sue in contract or tort, as he sees fit").

In opposition to these decisions, there is a substantial line of authority which squarely rejects the service/goods dichotomy, and which adopts a blanket rule against negligence suits where only economic loss is at stake. *See Long Island Lighting Co. v. Stone & Webster Eng'g Co.,* 839 F.Supp. 183, 187 n. 5 (E.D.N.Y.1993); *Carmania Corp. v. Hambrecht Terrell Int'l,* 705 F.Supp. at 940 (S.D.N.Y.1989) (suit against architect); *Bristol–Myers Squibb, Industrial Div. v. Delta Star, Inc.,* 206 A.D.2d 177, 620 N.Y.S.2d 196, 199 (4th Dep't 1994). Other courts, without considering the distinction proffered by plaintiff here, declined to allow negligence claims brought against service providers for pecuniary damages. *See AT & T v. N.Y.C. Human Resources Admin.,* 833 F.Supp. 962, 984 (S.D.N.Y.1993); *Long Island Lighting Co. v. Transamerica Delaval, Inc.,* 646 F.Supp. 1442, 1457 (S.D.N.Y.1986). Indeed, in *County of Suffolk,* the negligence claim rejected by the Second Circuit concerned a contract for services. 728 F.2d at 55–56. Moreover, the New York Court of Appeals, facing issues somewhat distinct from those at hand, cited favorably the teaching of Dean Prosser that "there is no visible reason for any distinction between one who supplies a chattel and one who erects a structure." *In-*

*man v. Binghamton Housing Auth.,* 3 N.Y.2d 137, 164 N.Y.S.2d 699, 143 N.E.2d 895 (1957) (*quoting* Prosser on Torts § 85 at 517 (2d ed. 1955)); *accord Key Int'l Mfg., Inc. v. Morse/Diesel, Inc.,* 142 A.D.2d 448, 536 N.Y.S.2d 792, 794 (2d Dep't 1988)[4]; *see also Am. Dredging Co. v. Plaza Petroleum Inc.,* 845 F.Supp. 91, 93 (E.D.N.Y.1993) (rejecting negligence claim brought in admiralty for economic injury, finding "no distinction between a supplier of goods and a supplier of services").

■ In short, there is a good deal of support, much of it irreconcilable, for each of the parties' positions. I find, however, that *Sommer,* the most recent and comprehensive treatment of this issue by the New York Court of Appeals, is not consistent with the argument advanced by Joseph. As noted above in that case, the court found that a negligence claim could not stand when it sought only a contractual remedy. The Court in *Sommer* allowed the negligence claim before it to proceed, as the plaintiff was "not seeking the benefit of its contractual bargain, but instead [sought] recovery for a fire that spread out of control—the sort of 'abrupt cataclysmic occurrence' " for which tort provided the proper avenue of relief. 583 N.Y.S.2d at 962, 593 N.E.2d at 1370 (citation omitted). In contrast, Joseph's negligence claim seeks damages for the same kinds of harm cited in his contract cause of action.

The claim at issue in *Sommer* alleged "negligent services," and thus that decision lends no support to the services/goods distinction. Instead, the Court of Appeals sought to determine if the damages at issue were analogous to those normally sought in tort. It thus confirmed that the purpose of restricting negligence claims for pecuniary

damages is to "keep contract law from drowning in a sea of tort." *Carmania Corp.,* 705 F.Supp. at 938 (citation and internal quotation marks omitted). The line which plaintiff asks the Court to draw does nothing to advance this goal: actions against service providers may be contractual in nature, just as claims against sellers of goods may properly sound in tort. Were I to adopt plaintiff's position, it would merely impose a further unnecessary distinction on a body of law already governed by an overly complex and contradictory set of rules.

Joseph presents no particular policy rationale for discriminating between service providers and merchants in this context. Searching the caselaw, I find none. The only apparent attempt at such a rationale is contained in *Robinson Redevelopment Co.* In that case, the court noted that most malpractice claims brought against professionals "regularly arise out of a contractual relationship and involve injury to property or pecuniary interests only." 547 N.Y.S.2d at 460. Therefore, the court noted that to preclude such causes of action would "eliminate the availability of malpractice claims against professionals such as architects where damages are essentially pecuniary in nature." *Id.* This reasoning does little more than state the result, without explaining why it is undesirable. In any event, my holding does no violence to properly brought claims for malpractice; it only bars these causes of action where a "count for malpractice masks a contract claim with the jargon of tort." *Carmania Corp.,* 705 F.Supp. at 937. When this is the case, there is no basis for allowing the tort cause of action to go forward, as the claim is one that appropriately falls within the ambit of contract law.

---

4. Joseph points out that, in *Key Int'l,* the court held only that no negligence action would lie for pecuniary harm when the parties were not in privity; indeed, the court reversed a grant of defendant's summary judgment motion on the ground that there were questions of fact as to the existence of privity. *See* Plaintiff's Mem. at 60 (*citing* 536 N.Y.S.2d at 795). The holding of *Key Int'l,* however, is ambiguous. While at times, the court appears to state that the presence of privity will allow a negligence action for economic loss to proceed, at others, it seems to state

only that the presence of privity would allow plaintiff to go forward on a contract claim. For example, the court stated the following:

[T]he rule is settled in New York that a plaintiff has no tort cause of action, in strict liability or in negligence, for economic loss suffered as a result of a defective product; the plaintiff's sole remedy is in contract.... The rule which eliminates tort liability for economic losses in the context of defective products has been applied in New York to defective buildings as well. This is logical.... 536 N.Y.S.2d at 794.

Although some Second Circuit and New York Court of Appeals decisions contain language supporting Joseph's position, those cases are either distinguishable or did not address the present issue. In *Paver & Wildfoerster* and *Sears, Roebuck & Co.*, the New York Court of Appeals addressed statute of limitations questions, and did not directly consider the issue presented here. Indeed, in the latter case, the Court specifically declined to "delineate the precise line of demarcation in the law of damages between damages based on contract liability and those based on tort liability." 401 N.Y.S.2d at 771, 372 N.E.2d at 559. In *Paver & Wildfoerster*, the Court merely noted that a plaintiff could elect whether to sue in contract or tort; it did not state that both actions could be brought simultaneously when only pecuniary damages were at stake. Similarly, in *William Wrigley, Jr.* and *Ajax Hardware Manufacturing* the Second Circuit did not specifically consider the kind of damages which a plaintiff needs to allege in a claim for negligent performance of contract. The only Second Circuit case which did address this question, *County of Suffolk*, held squarely for the position advanced by defendants. Moreover, the cases cited by plaintiff cannot override the more recent binding precedent of *Sommer*.

Finally, there is no other factor which, in the present case, would permit an exception to the rules outlined above. In *Trustees of Columbia Univ. v. Gwathmey Siegel* ("*Trustees*"), 192 A.D.2d 151, 601 N.Y.S.2d 116 (1st Dep't 1993), the court allowed a negligence action against defendant contractor, although the plaintiff sought damages only for economic loss, because the contract was "so affected with the public interest that the failure to perform can have catastrophic consequences." *Id.* 601 N.Y.S.2d at 118. Specifically, the plaintiffs alleged that the defendant failed to properly construct a tall building in a heavily trafficked area, and that this failure had already caused several pieces of the structure to fall into a nearby courtyard. *Id.* at 117–18.

The *Trustees* court relied on the potential consequences of the defendant's conduct to find that an extra-contractual duty attached.

It did not address the second "guidepost" established by *Sommer*, the nature of the remedy. In any event, *Trustees* made plain that "not every construction project may be found to be so intimately affected with the public interest as to invoke such a separate duty." *Id.* 601 N.Y.S.2d at 118. In the instant case, Joseph's negligence claim attacked defendants' alleged failure to develop suitable construction plans, develop a design within budget, and provide "construction administrative services" for a single apartment in an existing building. Amended Complaint ¶ 44. These claims do not remotely implicate the kind of interest discussed in *Trustees*, or the sort of "cataclysmic" event described in *Sommer*. They are allegations which belong to the realm of contract, and the defendants' summary judgment motion is therefore granted as to plaintiff's negligence claim.

### III. ASPC's Counterclaim

Plaintiff seeks summary judgment on ASPC's counterclaim on the ground that, because ASPC lacked a New York architecture license, it cannot seek to recover for work performed.

New York law restricts the practice of architecture to those who are "licensed or otherwise authorized" to engage in it. N.Y. Educ. Law § 7302. Architecture is defined, by New York statute, to include services which "require the application of the art, science and aesthetics of design and construction of buildings, including their appurtenances and the spaces around them wherein the safeguarding of life, health, property and public welfare is concerned." N.Y. Educ. Law § 7301. The defendants acknowledge that ASPC "acted as the architect responsible for the design of 3940." Defendants' 3(g) Response ¶ 2. Moreover, they concede that ASPC was involved in the preparation of design plans and construction drawings, *see* Defendants' 3(g) Statement ¶¶ 36, 39, 57; Lacovara Aff. ex. I (agreement by ASPC that it will "continue to be responsible for producing complete construction documents"), tasks clearly falling within New York's definition of architectural work. *See Marshall–Schule Assocs., Inc. v. Goldman,* 137 Misc.2d 1024, 523 N.Y.S.2d 16, 19

(N.Y.City Civ.Ct.1987) (production of "architectural-type drawings" was activity normally rendered by a licensed architect).

The parties further agree that neither Schwarz nor any other employee or shareholder of ASPC was licensed to practice architecture in New York at the time ASPC was working on the 3940 project. Plaintiff's 3(g) ¶ 1; Defendants' 3(g) Response ¶ 1. New York courts have held that, in general, "[w]here the company performing ... work is not licensed, it is precluded from recovering for the work performed either pursuant to contract of quantum meruit." *Charlebois v. J.M. Weller Assocs., Inc.,* 72 N.Y.2d 587, 535 N.Y.S.2d 356, 359, 531 N.E.2d 1288, 1291 (1988) (architect or engineer); *accord Gordon v. Adenbaum,* 171 A.D.2d 841, 567 N.Y.S.2d 777, 777 (2d Dep't) (architect), *appeal dism.,* 79 N.Y.2d 820, 580 N.Y.S.2d 191, 588 N.E.2d 89 (N.Y.1991); *Hammerman v. Jamco Industries, Inc.,* 119 A.D.2d 544, 500 N.Y.S.2d 718, 719 (2d Dep't 1986) (home improvement contractor).

 The defendants argue that Joseph is estopped from raising this issue because he knew ASPC was unlicensed and agreed, in his contract with ASPC, to insure that the requirements of New York's licensing law were met. This argument is based on the following clause in the Letter Agreement:

> You [Joseph] understand that neither David M. Schwarz/Architectural Services, P.C. nor any of its employees are licensed [sic] to practice Architecture in New York and that we are providing you with design services only. Any requisite of New York law for licensed professional services will be supplied by you, the owner.

Letter Agreement ¶ 4. Joseph also stated in the Letter Agreement that he would supply licensed structural, mechanical, and electrical engineers who would be responsible for production and certification of drawings as required by applicable codes. *Id.* ¶ 6.

ASPC's assertion that Joseph's knowledge of its unlicensed status bars him from invoking that fact for his own benefit finds support in *Wormuth v. Lower Eastside Action Project, Inc.,* 71 Misc.2d 314, 335 N.Y.S.2d 896 (Sup.Ct. Appellate Term—1st Dep't 1972) (per curiam). In *Wormuth,* the plaintiff alleged that the defendant knew it lacked a New York architecture license but "waited until plaintiff's services were completed and then raised the question of the license to avoid payment." *Id.* 335 N.Y.S.2d at 896. In these circumstances, the court found the defendant to be estopped from raising New York's licensing statutes as a defense to plaintiff's claims. *Id.* at 897.

The principles set forth in *Wormuth* were rejected by a 3–2 majority of the Appellate Division, Second Department in *Millington v. Rapoport,* 98 A.D.2d 765, 469 N.Y.S.2d 787, 788 (2d Dep't 1983). The *Millington* court found that, were estoppel a valid defense to New York licensing requirement, the mandate of the statute could be avoided, and the public policy which underlies it vitiated, by "the simple expedient" of notifying the other contracting party of the fact that an entity was unlicensed. *Id.* 469 N.Y.S.2d at 788. The two dissenting justices argued that considerations of "fundamental fairness" dictated the opposite result. *Id.* at 789 (Titone, J., dissenting).

Subsequent decisions have generally followed the majority in *Millington. See Chosen Constr. Corp. v. Syz,* 138 A.D.2d 284, 525 N.Y.S.2d 848, 850 (1st Dep't 1988) (embracing *Millington* holding in *dicta* ); *Robert M. Padden Constr., Inc. v. Reitkopf,* 146 Misc.2d 272, 550 N.Y.S.2d 523, 524–25 (Suffolk Co.Ct. 1989) (same); *Cudahy v. Cohen,* N.Y.L.J., Jan. 31, 1997, at 31, col. 6. Moreover, the principles enunciated therein are consistent with the purpose of the statute at issue here: the "safeguarding of health, property and public welfare." N.Y.Educ.Law § 7301; *see also Marshall–Schule Assocs.,* 523 N.Y.S.2d at 19 (citation omitted) ("The obvious and avowed purpose of [sections 7201 and 7302] of the New York Education Law is to safeguard the life, health, and property of the citizens of New York"). Because the statute is not intended merely to benefit the contracting parties, they should not be able to render its content a nullity by agreeing in advance that they will not be bound thereby. Moreover, while the adoption of the *Millington* majority's position would undoubtedly work injustice in particular cases, the contracting architects could avoid any harm by

refraining from performing work for which they are not licensed. *See Marshall–Schule Assocs.*, 523 N.Y.S.2d at 18 (it does not impose a "draconian obligation" on unlicensed architect to require them "to refuse to prepare architectural designs and drawings for ... structural work" as soon as the nature of the work to be done becomes apparent).

These principles are consistent with *Charlebois*, the most recent decision of the New York Court of Appeals on this issue. In that case, an owner contracted with a for-profit corporation for construction of a warehouse. Although the contractor was not a professional corporation licensed to perform architectural services, its president, James Weller, possessed the requisite license. Therefore, the contract noted that the "architect/engineer" for the project would be supplied by the contractor "pursuant to an agreement" with Weller. 535 N.Y.S.2d at 358, 531 N.E.2d at 1290.

The Court of Appeals concluded, in a 4–3 decision, that this arrangement passed muster under the terms of Educ. Law § 7302. In reaching this decision, the court noted that if the defendant had "either contracted itself to engage *or actually engaged* in the practice of engineering, then the licensing proscription would surely have been violated with grave contractual and criminal consequences."[5] *Id.* at 358–59, 531 N.E.2d at 1290–91 (emphasis added). Specifically, the court noted that performance of unlicensed work would result in the aforementioned ban on recovery under contract or pursuant to quantum meruit. *Id.* at 359, 531 N.E.2d at 1291.

The court found an exception to these strict requirements, however, where "the contract expressly required that the contractor engage a specified licensed person or professional corporation to perform the tasks for which the law specifically requires a license," *id.*, and that individual "actually performed" those tasks. *Id.* at 360, 531 N.E.2d at 1292. In reaching this holding, the *Charlebois* court stated that forfeitures are "strongly disfavored" under New York law,

and decried the "slavish" invocation of the public policy established by New York Education Law, noting that efforts to use it as a "sword for personal gain" should not be countenanced. *Id.* at 360, 531 N.E.2d at 1292. Therefore, the Court declined to establish an "absolute or per se rule" barring recovery. *Id.* at 359, 351 N.E.2d at 1291. In short, while *Charlebois* states that "actual performance" of unlicensed services is a bar to recovering for the work completed, a determination of whether the licensing statutes have, in fact, been complied with should not be made based solely on a rigid construction of the relevant law, but must take into account the policy concerns outlined in that decision. *See Marketing Specialists, Inc. v. Bruni*, 129 F.R.D. 35, 48 (W.D.N.Y.1989) (citation omitted) (in considering whether failure to obtain license should bar recovery, court should consider "whether denial of relief is wholly out of proportion to the requirements of public policy or appropriate individual punishment"), *aff'd mem.*, 923 F.2d 843 (2d Cir.1990); *Todisco v. Econopouly*, 155 A.D.2d 441, 547 N.Y.S.2d 103, 106 (2d Dep't 1989) (Rosenblatt, J., concurring) (same), *appeal dism.*, 76 N.Y.2d 772, 559 N.Y.S.2d 985, 559 N.E.2d 679 (1990).

In certain circumstances, New York courts have found that a licensed entity may have sufficient responsibility over the architectural or engineering work being performed to render that work complaint with New York Education Law despite the fact that the contracting party itself is unlicensed. This has been the case where "the engineer actually supervising the work was licensed in New York," *Tetra Technologies, Inc. v. Harter*, 823 F.Supp. 1116, 1118 (S.D.N.Y.1993) ("*Tetra*"), "all the plans and specifications ... with the architectural and engineering phases of the [building] were duly prepared by licensed and certified architects and engineers," *Vereinigte Osterreichische Eisen und Stahlwerke, A.G. v. Modular Bldg. and Development Corp.*, 64 Misc.2d 1050, 316 N.Y.S.2d 812 (N.Y.Co.Sup.Ct.1970), *modified on other grounds*, 37 A.D.2d 525, 322

---

**5.** The unauthorized practice of a profession is a felony under New York law. *See* N.Y.Educ.Law § 6512.

N.Y.S.2d 976 (1st Dep't 1971) ("*Vereinigte*"), or "[a]ll the work actually performed and which was to be done by the plaintiff was subject to the approval of a registered architect or engineer in the employ of the defendant," *Clement S. Crystal, Inc. v. Denberg,* 237 N.Y.S.2d 102, 105 (N.Y.Co.Sup.Ct.1962).

ASPC argues that, although it was not licensed to practice architecture in New York, the requisites of New York's Education Law were complied with by other means. First, it points to Joseph's retention of licensed engineer Charles Kupfer,[6] who "reviewed [ASPC's] architectural drawings and determined whether they complied with the applicable state and local codes; drew, signed and sealed all drawings for 3940 that were required to be filed with the state and local authorities; and provided advice to [ASPC] on code issues throughout the project." Defendants' 3(g) Response ¶ 2. Second, it notes Joseph's use of other licensed structural, mechanical, electrical and plumbing engineers on the project. *Id.*

Defendants' first argument is unavailing. While there is some disagreement between the parties as to the scope of Kupfer's responsibilities, defendants' own filings make clear that Kupfer was responsible, not for supervising ASPC's architectural work, but for ensuring that ASPC complied with New York building codes. Schwarz himself stated that he did not have "a great deal of understanding as to what [Kupfer] was or wasn't doing." Schwarz Dep. at 726. Both ASPC's project managers asserted, however, that Kupfer reviewed the architectural drawings for 3940 only when they implicated issues of code compliance. *See* Beidler Dep. at 244; Williams Dep. at 166. Kupfer essentially confirms this characterization. *See* Kupfer Dep. at 15. Indeed, this description of Kupfer's responsibilities is consistent with that set forth in defendants' Rule 3(g) statement. *See supra.* There is, furthermore uncontradicted evidence that the drawings used to obtain the requisite permits were not those relied on for actual construction. Tucker Dep. at 180. Thus, even when all reasonable inferences are drawn in the defendants' favor, the function played by Kupfer in this case simply does not resemble the supervisory role described in the cited cases. His tasks involved insuring that the plans complied with various regulations; there is no evidence that he reviewed ASPC's architectural work for any other purpose.

The capacity in which other licensed engineering personnel were involved in the 3940 project is less well-defined, and was sparsely briefed by the parties. Joseph acknowledged that, in accordance with his obligations under the Letter Agreement, he retained licensed individuals to work on the "structural drawings" and other engineering tasks. Joseph Dep. at 237. According to Schwarz, ASPC's design plans were, at least on some occasions, forwarded to the licensed engineers for comment. *See* Schwarz Aff. ¶¶ 36, 41. The defendants, moreover, have submitted evidence indicating that these other licensed professionals had a role that went beyond code compliance review, and that they were asked for to examine certain proposed designs for their structural soundness. *See*

6. The defendants appear to assume, without so stating, that employment of a licensed *engineer* is sufficient to meet New York's architecture licensing requirements. I accept this assumption as accurate. The statutory definitions of these professions are not materially different for present purposes. *Compare* N.Y.Educ.Law § 7201 (engineering includes, *inter alia*, "consultation, investigation, evaluation, planning, design or supervision of construction or operation in connection with ... buildings ... wherein safeguarding of life, health and property is concerned, when such service or work requires the application of engineering principles or data") *with* § 7301 (architecture involves "application of the art, science, and aesthetics of design and construction of buildings ... wherein the safeguarding of life, health, property, and public welfare is concerned. ..."). As a New York court stated in regard to the definitions contained in the predecessors statute, the primary difference between these provisions, as they concern building design, is that they grant architects, but not engineers, jurisdiction over the aesthetic domain. *See D'Luhosch v. Andros,* 200 Misc. 400, 109 N.Y.S.2d 491, 492 (Duchess County Ct.1951). Without denigrating the importance of this realm, aesthetic expertise is not required to insure the public safety concerns underpinning the licensing regime. Indeed, the caselaw appears to make no distinction between these professions when faced with the issue at hand. *Cf. Charlebois,* 535 N.Y.S.2d at 357, 531 N.E.2d at 1289 (referring to licensed engineer as "architect-engineer").

Defendants' Ex. 7 (Letter from ASPC to Irwin Cantor, P.C. asking him to review plans for "major structural problems"); *Id.* ex. 10 (request that engineers review drawings for "structural, plumbing or mechanical problems").

Plaintiff contends that Schwarz supervised the work of all licensed engineering professionals, Plaintiff's 3(g) Response ¶¶ 9, 24, citing general statements by Joseph expressing the belief that Schwarz had overall responsibility for the 3940 project. *See* Joseph Dep. at 1001–02. These imprecise descriptions by the plaintiff himself are insufficient to demonstrate the specific role played by the licensed professionals in the design of 3940.

■ Thus, while the record is not clear as to whether all of ASPC's work was subject to sufficient supervision to fall within the ambit of *Vereinigte* or *Clement S. Crystal, Inc.,* the plaintiff has failed to meet its burden to show the absence of a material fact on this issue. Indeed, plaintiff's memoranda are silent as to the tasks performed by the licensed engineers, with the exception of Kupfer. In light of Joseph's contractual agreement to insure that the requisites of New York licensing law were met, and the evidence adduced by the defendants that certain design drawings were submitted to licensed engineers for their consideration, I cannot say on the basis of the present record that ASPC violated the New York Education Law, and plaintiff's summary judgment motion is therefore denied.

The defendants also have not presented sufficient evidence to warrant summary judgment on this issue. As discussed above, they have submitted minimal proof on the tasks actually overseen by licensed professionals in reviewing or supervising ASPC's work. Moreover, while defendants challenge the constitutionality of New York's licensing regime, their argument cannot be used to evade this factual ambiguity. The constitutional argument defendants advance is based entirely on Judge Broderick's extended *dicta* in *Tetra.* In that opinion, Judge Broderick found that New York law would run afoul of the Commerce Clause *if* it prohibited an unlicensed out-of-state contractor from working in New York despite being supervised by

a fully licensed professional. 823 F.Supp. at 1121.

I need express no view as to the correctness of Judge Broderick's analysis. I have held, as did Judge Broderick, *id.* at 1121 n. 8, that New York law *does* permit an unlicensed entity to engage in architectural or engineering work if it is supervised by one licensed in New York to perform these functions. The question at issue here is whether ASPC, in fact, had the requisite supervision.

Because ASPC has failed to demonstrate on this record that it complied with the New York Education Law, defendants are not entitled to summary judgment. I need not reach plaintiff's other arguments made in opposition to defendants' summary judgment motion.

## CONCLUSION

For the foregoing reasons, the defendants' summary judgment motion is granted as to plaintiff's negligence claim and the breach of contract claim brought individually against Schwarz. The cross-motions for summary judgment on ASPC's counterclaim are denied.

Counsel for both parties are directed to attend a status conference in Room 17C, 500 Pearl Street, at 2 P.M. on March 21, 1997.

It is SO ORDERED.